[No. 54592-8. En Banc. March 30, 1989.]

E. ROSA YOUNG, as *Guardian, Appellant,* v. KEY PHARMACEUTICALS, INC., ET AL, *Respondents.*

*John P. Walsh,* for appellant.

*Carol Lee Moody* and *Philip A. Talmadge* (of *Karr, Tuttle, Koch, Campbell, Mawer, Morrow & Sax, P.S.*), for respondent Key Pharmaceuticals.

*Reed, McClure, Moceri, Thonn & Moriarty,* by *William R. Hickman* and *Heather Houston,* for respondent Children's Orthopedic Hospital.

*Lee, Smart, Cook, Martin & Patterson, P.S.,* by *Jeffrey P. Downer,* for respondents Bierman.

*Williams, Kastner & Gibbs,* by *John A. Rosendahl* and *Elizabeth A. Christianson,* for respondents Case.

*Brian P. Harnetiaux, Robert H. Whaley,* and *Daniel E. Huntington* on behalf of Washington Trial Lawyers Association, amici curiae for appellant.

*Russell C. Love* on behalf of Washington Defense Trial Lawyers, amici curiae for respondents.

UTTER, J.—Plaintiff brought this action for medical malpractice and product liability before the King County Superior Court. That court granted summary judgment of dismissal in favor of all the defendants, and plaintiff appealed to the Court of Appeals. Finding this case to present "urgent issues of broad public import requiring prompt and ultimate determination," the Court of Appeals certified the matter to this court under RCW 2.06.030(d).

This case raises two issues. The first is whether the appointment of a guardian ad litem to a legally incompetent person activates the statute of limitations, overriding the tolling statute for such persons, RCW 4.16.190. We hold that it does not and reverse the ruling of the trial court. The second issue is whether, in opposing a summary judgment motion, the affidavit of a licensed pharmacist alone is sufficient to raise issues of material fact regarding the standard of care owed by a physician to a patient. We hold that it is not and affirm the trial court's ruling on this issue.

Devan Young sought treatment for acute asthma at Children's Orthopedic Hospital and Medical Center. As part of his treatment, Devan took the drug theophylline. The therapeutic qualities of theophylline vary with the level of the drug in the patient's bloodstream. The optimum blood level

lies between 10 and 20 micrograms per milliliter. Levels over 20 are potentially toxic and can result in brain damage or death. To achieve the proper blood level, the correct dosage may vary with the size and weight of the child, as well as the rate at which the child metabolizes the drug. Health care providers must monitor the initial doses to insure that the proper blood level is reached.

Dr. Ronald Case was one of the doctors who treated Devan at Children's Orthopedic Hospital. When he first saw Devan in September 1978, Devan was taking the theophylline preparation Elixophyllin, 20 cc every 5 to 6 hours. Clerk's Papers, at 56. Because this medication required Devan's mother to get up in the middle of the night to administer one of the doses, Dr. Case changed Devan's prescription to Theo–Dur. Theo–Dur is a timed–release theophylline preparation which requires fewer doses per day to achieve the proper blood level. Dr. Case prescribed 200 mg of Theo–Dur to be taken twice daily. Clerk's Papers, at 56–57. Sometime in the middle of January 1979, Devan's prescription was changed to 300 mg twice daily. Dr. Case saw Devan on January 26, 1979 and checked his theophylline level, which was 11.8 micrograms per milliliter—well within the therapeutic range. Clerk's Papers, at 58.

On February 1, 1979, Devan began to have seizures. Brought to Children's Orthopedic Hospital for emergency treatment, his theophylline level was found to be 68 micrograms per milliliter. Clerk's Papers, at 58. As a result of this high level, Devan became disabled and will probably need custodial care for life as a result of permanent brain damage.

Early in 1982, Rosa Young was appointed her son's guardian ad litem. In that capacity she filed suit in federal District Court for the Western District of Washington on June 1, 1982. She named as defendants the Hospital and Key Pharmaceuticals, Inc., the manufacturer of Theo–Dur. By stipulation of the parties, that court dismissed the action without prejudice. Over 3 years later, on June 11, 1986, Ms. Young filed the present medical malpractice and

products liability action in King County Superior Court, naming the Hospital, the treating physicians and the pharmaceutical company as defendants.

At trial, each of the defendants moved separately for summary judgment. All defendants argued that Devan's claim was barred by the applicable statutes of limitation. *See* Laws of 1975, 2d Ex. Sess., ch. 56, § 1, p. 214 (former RCW 4.16.350) (medical malpractice); RCW 4.16.080(2) (products liability). The trial court dismissed plaintiff's case on this ground. The medical defendants also presented two affidavits—from Dr. John Neff (Chief of Staff at Children's Orthopedic) and Dr. Case—in response to plaintiff's allegations of medical malpractice. The plaintiff responded with an affidavit by Ms. Jan Dotson, a licensed pharmacist. Ms. Dotson alleged that Devan's physicians did not meet the accepted standard of care in prescribing the dosage of Theo–Dur and monitoring blood levels. The trial court ruled that this latter affidavit failed to raise genuine issues of material fact over whether the treating physicians or the Hospital breached the standard of care. The plaintiff appealed these summary judgment rulings.

## I

It is alleged that plaintiff brought the present action after the time allowed by the relevant statutes of limitations had run. In cases of minority or mental disability, however, RCW 4.16.190 tolls the statute of limitations. RCW 4.16.190 provides:

> If a person entitled to bring an action mentioned in this chapter, except for a penalty or forfeiture, or against a sheriff or other officer, for an escape, be at the time the cause of action accrued either under the age of eighteen years, or incompetent or disabled to such a degree that he or she cannot understand the nature of the proceedings, such incompetency or disability as determined according to chapter 11.88 RCW, or imprisoned on a criminal charge, or in execution under the sentence of a court for a term less than his natural life, the time of such disability shall not be a part of the time limited for the commencement of action.

The trial court held that the appointment of Rosa Young as Devan's guardian ad litem effectively ended the disability envisioned by the tolling statute, causing the statute of limitations to begin running upon the appointment. Respondents argue in addition that the filing of the federal action in 1982 also had the same effect. These interpretations are incorrect and we reverse this portion of the trial court's ruling.

The tolling statute's plain language indicates that the right it confers on the "person entitled to bring an action" is not diminished by the appointment of a guardian. The words "the time of such disability" refer to the person's disabling condition itself, not merely the disability to bring suit. This focus on the disabling condition is reinforced by the reference to RCW 11.88. This reference incorporates the following definitions into the tolling statute:

An "incompetent" is any person who is either:
(a) Under the age of majority, as defined in RCW 11.92.010, or
(b) Incompetent by reason of mental illness, developmental disability, senility, habitual drunkenness, excessive use of drugs, or other mental incapacity, of either managing his property or caring for himself or both.
. . .
. . . [T]he term "disabled person" means an individual who is in need of protection and assistance by reason of mental illness, developmental disability, senility, habitual drunkenness, excessive use of drugs, or other mental incapacity, but cannot be found to be fully incompetent.

RCW 11.88.010(1), (2). These definitions focus on the disabling conditions themselves, not merely their legal consequences.

The tolling statute makes no mention of the effect of a guardian's appointment, which we believe means that the statute was intended to operate regardless of the guardian's presence. We cannot assume the Legislature made this omission through oversight; it was aware of the practice of appointing guardians for legally incompetent persons for

the purpose of bringing lawsuits. The reference to RCW 11.88 bears this out: this source for the tolling statute's definitions concerns the appointment, qualification, and removal of guardians.

We have acted on this principle in the past. In *Hatzenbuhler v. Harrison,* 49 Wn.2d 691, 306 P.2d 745 (1957), we recognized the right of a minor plaintiff to bring an action any time during her legal disability regardless of the general statute of limitations. 49 Wn.2d at 699–700. In that same case, we held that the minor's guardian, who had brought the action on the minor's behalf as well as his own, was time barred in his own personal claim. *Hatzenbuhler,* at 698. Thus, the guardian's appointment did not affect the right of the minor to toll the statute of limitations.

The language of RCW 4.16.190 requires that the legally incompetent person who claims the protection of the statute must be "a person entitled to bring an action". In other words, the cause of action must vest in the incompetent person directly, not solely in the guardian acting on the person's behalf. If the cause of action is available to the guardian alone, then the statute of limitations will apply. *Huntington v. Samaritan Hosp.,* 101 Wn.2d 466, 469, 680 P.2d 58 (1984). In *Huntington,* the personal representative of the decedent brought a wrongful death action that would benefit the decedent's minor children. The action was brought after the time normally allowed by the statute of limitations. We held that RCW 4.16.190 did not apply because the children themselves could not bring the wrongful death action; only the decedent's personal representative was so entitled. Therefore, the children in *Huntington* were not "person[s] entitled to bring an action" and were not protected by the tolling statute.

Respondents argue that *Huntington* controls the present case. When viewed in light of the above discussion, however, this argument has no merit.

The rule that we follow is the majority rule in this country. *See* Annot., *Tolling of State Statute of Limitations in*

*Favor of One Commencing Action Despite Existing Disability,* 30 A.L.R.4th 1092 (1984); Annot., *Appointment of Guardian for Incompetent or for Infant as Affecting Running of Statute of Limitations Against Ward,* 86 A.L.R.2d 965 (1962); *see also Hervey v. Rawson,* 164 Mass. 501, 41 N.E. 682 (1895); *Wallisch v. Fosnaugh,* 126 Mich. App. 418, 336 N.W.2d 923 (1983); *Sahf v. Lake Havasu City Ass'n for Retarded & Handicapped,* 150 Ariz. 50, 721 P.2d 1177 (Ct. App. 1986). This is the rule in virtually every state except North Carolina. Even in that state the tolling statute will apply when the cause of action is clearly vested in the legally incompetent person rather than in a guardian charged with the duty to bring suit on the incompetent person's behalf. *See Genesco, Inc. v. Cone Mills Corp.,* 604 F.2d 281 (4th Cir. 1979) (applying North Carolina law); *Anderson v. Canipe,* 69 N.C. App. 534, 317 S.E.2d 44 (1984).

 Respondents also argue that even if the statute of limitations remained tolled upon Ms. Young's appointment as Devan's guardian, it nonetheless began to run upon the filing of the 1982 action in federal district court. This argument has no merit. RCW 4.16.190 tolls the statute of limitations for a legally incompetent person notwithstanding the appointment of a guardian. This is so because the right to the tolling statute vests in the incompetent person not in the guardian. From this premise, it follows that the guardian's subsequent actions on the incompetent person's behalf should have no additional effect upon the statute of limitations unless they result in res judicata. The Youngs' first suit ended in dismissal without prejudice, and therefore was not a final judgment. Thus, the statute remained tolled. This is also the majority rule in the United States:

> In case of the appointment of a guardian ad litem for an infant, it is held that such guardian can sue within the prescribed period of limitation, but is not obligated to do so, and that if he fails to sue, or having instituted an action within the statutory period, discontinues it, the

224

rights of the infant are not prejudiced thereby, and he may still take advantage of his disability . . .

Annot., 86 A.L.R.2d at 976; *see also Snare & Triest Co. v. Friedman,* 169 F. 1 (3d Cir.), *cert. denied,* 214 U.S. 518, 53 L. Ed. 1065, 29 S. Ct. 700 (1909); *McLaughlin v. Beyer,* 181 Ala. 427, 61 So. 62 (1913).

 Respondents argue that such a construction of RCW 4.16.190 would result in the statute of limitations never running in the case of a permanently disabled or incompetent person. This outcome, they claim, would frustrate the purpose of the statute of limitations by removing it altogether. Nevertheless, this result flows from unmistakably clear statutory language. We will not imply exceptions to statutes of limitation where they have not been expressly provided by the Legislature. *Citizens Interested in Transfusion of Yesteryear v. Board of Regents,* 86 Wn.2d 323, 327, 544 P.2d 740 (1976) (provisos regarding statute of limitations in SEPA strictly construed); *Seamans v. Walgren,* 82 Wn.2d 771, 775, 514 P.2d 166 (1973). Moreover, if one reads RCW 4.16.190 as a whole, the indefinite time span allowed a permanently incompetent person in which to sue is not an absurd result. The statute tolls the statute of limitations for a potential plaintiff "imprisoned on a criminal charge, or in execution under the sentence of a court for a term less than his natural life . . ." A prison term less than the plaintiff's natural life may in fact not be any shorter than the life–span of a person with a permanent mental disability. Further, it would be incongruous, without a clear directive from the Legislature, to construe arbitrarily the rights of such a disabled person to be less than a person sentenced to, for example, 40 years in prison. We therefore find that the statute of limitations has remained tolled since the time of Devan's disability, regardless of Ms. Young's appointment as his guardian ad litem and regardless of the previous case filed and dismissed without prejudice in federal district court. Because the trial court dismissed respondent Key Pharmaceuticals, Inc., solely

upon the basis of its erroneous interpretation of RCW 4.16.190, this respondent is still a viable defendant.

## II

In addition to its interpretation of RCW 4.16.190, the trial court had additional grounds for granting summary judgment for the medical malpractice defendants—that the plaintiff had not produced competent evidence of malpractice to raise an issue of material fact. We affirm this latter ruling.

In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact. *See LaPlante v. State,* 85 Wn.2d 154, 158, 531 P.2d 299 (1975). If the moving party is a defendant and meets this initial showing,[1] then the inquiry shifts to the party with the burden of proof at trial, the plaintiff. If, at this point, the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial", then the trial court should grant the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–32 (9th Cir. 1987). In *Celotex,* the United States Supreme Court explained this result: "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." 477 U.S. at 322–23.

In making this responsive showing, the nonmoving party cannot rely on the allegations made in its pleadings. CR 56(e) states that the response, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing

---

[1]The moving defendant may meet the initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

that there is a genuine issue for trial."[2] At that point, the evidence and all reasonable inferences therefrom is considered in the light most favorable to the plaintiff, the nonmoving party. An appellate court reviewing a summary judgment places itself in the position of the trial court and considers the facts in a light most favorable to the nonmoving party. *Del Guzzi Constr. Co. v. Global Northwest Ltd.*, 105 Wn.2d 878, 882, 719 P.2d 120 (1986).

■ While *Celotex* is not binding upon us, Washington courts treat as persuasive authority federal decisions interpreting the federal counterparts of our own court rules. *See, e.g., American Discount Corp. v. Saratoga West, Inc.*, 81 Wn.2d 34, 499 P.2d 869 (1972); *Rinke v. Johns–Manville Corp.*, 47 Wn. App. 222, 225, 734 P.2d 533 (1987). Indeed, our own Court of Appeals has noted the *Celotex* rule. *See Controlled Atmosphere, Inc. v. Branom Instrument Co.*, 50 Wn. App. 343, 350, 748 P.2d 686 (1988).

The *Celotex* standard comports with the purpose behind the summary judgment motion: "to examine the sufficiency of the evidence behind the plaintiff's formal allegations in the hope of avoiding unnecessary trials where no genuine issue as to a material fact exists." *Zobrist v. Culp*, 18 Wn. App. 622, 637, 570 P.2d 147 (1977). Thus, a defendant may move for summary judgment on the ground the plaintiff lacks competent medical evidence to make out a prima facie case of medical malpractice.

In this case, although not required to, the medical defendants supported their motions with affidavits. These affidavits are unanimous that Devan received proper treatment while in the medical defendants' care. Defendants'

---

[2]The dissent in *Celotex* specifies what the nonmoving plaintiff must do upon the moving party's successful initial showing:

(1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f).

477 U.S. at 332 n.3 (Brennan, J., dissenting).

assertions that plaintiff lacks competent evidence to support a prima facie case of medical malpractice are correct. Because plaintiff has not presented competent evidence to rebut the defendants' initial showing of the absence of a material issue of fact, the medical defendants are entitled to summary judgment.

## III

 Is a pharmacist competent to testify to whether Devan's physicians breached their standard of care when that pharmacist's sole connection to this case is that she reviewed Devan's medical records? Even granting the benefit of every leniency to the plaintiff as the nonmoving party, the answer must be no. As one court put it:

> "More than twenty–three hundred years ago Aristotle, in his work on Politics, wrote: 'As a physician ought to be judged by the physician, so ought men to be judged by their peers.' And for centuries the courts of this and other countries have, almost without exception, held that expert medical evidence is required to establish negligence respecting the service a physician or a surgeon renders his patient."

*Rodriguez v. Jackson,* 118 Ariz. 13, 17, 574 P.2d 481 (1977), quoting *Shea v. Phillips,* 213 Ga. 269, 98 S.E.2d 552 (1957). In *Rodriguez,* the court held that affidavits by a pharmacologist, a professor of biology, and a registered nurse were insufficient to establish a standard of care for a physician, and granted the defendant physician's motion for summary judgment in a medical malpractice action.

It is true that this court has rejected the rule that nonphysicians are per se disqualified from testifying as experts in medical malpractice actions. *Harris v. Groth,* 99 Wn.2d 438, 450, 663 P.2d 113 (1983). This court has never accepted, however, a rule that would allow a nonphysician to testify as an expert regarding the proper standard of care for a physician practicing a medical specialty. Such a rule would severely degrade administration of justice in medical malpractice actions.

This court's opinion in *Harris* reaffirmed the rule:

In general, expert testimony is required when an essential element in the case is best established by an opinion which is beyond the expertise of a layperson. . . . Medical facts in particular must be proven by expert testimony unless they are "observable by [a layperson's] senses and describable without medical training". . . . Thus, expert testimony will generally be necessary to establish the standard of care . . . and most aspects of causation . . ."

*Harris,* at 449. This rule comports with the common law, as set forth in 2 J. Wigmore, *Evidence* § 568 (1979).

Nonexpert testimony is sometimes admissible for matters such as observations of health, disease, or injury. Where the determination of negligence does not require technical medical expertise, such as the negligence of amputating the wrong limb or poking a patient in the eye while stitching a wound on the face, the cases also do not require testimony by a physician. *See, e.g., Killingsworth v. Poon,* 167 Ga. App. 653, 656, 307 S.E.2d 123 (1983); *Pharmaseal Labs., Inc. v. Goffe,* 90 N.M. 753, 568 P.2d 589, 594 (1977). However, we have found no cases in which a nonphysician is found competent to testify on a physician's technical medical standard of care in a medical malpractice case. Rather, the cases uniformly hold that a physician's testimony is necessary in such cases to defeat a defendant's motion for summary judgment. *See, e.g., Hoopiiaina v. Intermountain Health Care,* 740 P.2d 270 (Utah App. 1987); *Majeed v. McBryar,* 184 Ga. App. 807, 363 S.E.2d 59 (1987); *Solon v. Godbole,* 163 Ill. App. 3d 845, 516 N.E.2d 1045 (1987); *Hanzlik v. Paustian,* 216 Neb. 575, 344 N.W.2d 649, *cert. denied,* 469 U.S. 854 (1984); *Peterson v. Kilzer,* 420 N.W.2d 754 (N.D. 1988). As the Missouri Supreme Court stated:

What is or is not standard practice and treatment in a particular case, or whether the conduct of the physician measures up to the standard is a question for experts and can be established only by their testimony.

"The only exception to such rule is that where the want of skill or lack of care is so apparent as to be within

the comprehension of laymen and requires only common knowledge and experience to understand and judge it, expert evidence is not essential."

*Hart v. Steele,* 416 S.W.2d 927, 932, 37 A.L.R.3d 456, 462 (Mo. 1967), quoting *Modrzynski v. Lust,* 88 N.E.2d 76 (Ohio Ct. App. 1949). In fact, not even a medical degree bestows the right to testify on the technical standard of care; a physician must demonstrate that he or she has sufficient expertise in the relevant specialty. *E.g., Purtill v. Hess,* 111 Ill. 2d 229, 489 N.E.2d 867, 872–73 (1986).

The case of *Bell v. Hart,* 516 So. 2d 562 (Ala. 1987) is directly on point. In *Bell,* plaintiff's physician prescribed the antidepressant drug Elavil for plaintiff's complaints of headaches, weakness, insomnia, agitation, depression, and painful leg cramps. 516 So. 2d at 563. After taking the first prescribed dosage, plaintiff became incoherent and confused, and was treated in an emergency room. 516 So. 2d at 564. Plaintiff sued her physician for medical malpractice and he moved for summary judgment, alleging she had failed to present expert medical testimony that he was negligent. The defendant sought to exclude the testimony of plaintiff's witnesses, a pharmacist and a psychologist, on the ground that they were not competent to testify as experts.

The credentials of the pharmacist in *Bell* were even more impressive than those of the pharmacist in the instant case. He had earned a Doctor of Pharmacy degree and had taken courses in pharmacotherapeutics. He was an assistant professor of family medicine and a consultant in drug therapy for medical students and medicine residents. He was responsible for a drug and toxicology laboratory at a hospital and screened blood for quantities of various drugs, and was familiar with literature on various prescriptive drugs. Despite these credentials, the court in *Bell* held the trial court properly excluded his testimony on the ground that a pharmacist is not competent to testify as an expert on the standard of care of a physician in prescribing a drug. 516 So. 2d at 566. The *Bell* court distinguished cases in which

nonphysicians are competent to testify to symptoms, as opposed to a physician's standard of care. 516 So. 2d at 567. It also distinguished cases in which the lack of care is so apparent as to be understood by a layman: "[I]t is inconceivable that a layperson could comprehend the standard of care applicable to the prescription of Elavil." 516 So. 2d at 568.

In the instant case, lay testimony may be admitted to show Devan's obvious impairments. However, the physician's standard of care regarding proper dosages of medication is not within the scope of matters on which nonphysicians are competent to testify. Although a pharmacist may be more familiar with the names of medication, the literature, and perhaps the usual practice of physicians prescribing certain medications than other nonphysicians, a pharmacist is not competent to testify on the physician's standard of care for treatment using medication.

The affidavits introduced at trial in this case illustrate the discrepancy between a physician's and a pharmacist's expertise and why the pharmacist's affidavit should not be considered. To allow a pharmacist's testimony on a physician's standard of care runs counter to public policy in the administration of justice in medical malpractice trials. With all due respect to the pharmaceutical profession, pharmacists are not doctors and are not licensed to prescribe medication because they lack the physician's rigorous training in diagnosis and treatment. As Dr. Case's second affidavit in response to Ms. Dotson's affidavit illustrates, this lack of training might lead to error in a pharmacist's assessment of proper treatment. Clerk's Papers, at 143–45.

This case presents troubling questions about how a young child came to be injured in the course of being treated for an acute asthma condition. Perhaps we will never know the answers to these questions. Nevertheless, the only competent evidence presented shows that Devan's injuries were not caused by medical malpractice. It is unjust to subject defendants to a trial in the absence of a showing that the plaintiff can make out a prima facie case. To rule

otherwise would place physicians in the position of being forced to defend medical malpractice suits where the plaintiffs have no competent evidence of negligence.

## IV

Because the plaintiff here has not presented competent evidence regarding the physicians' standard of care, we affirm the summary judgment in favor of the medical defendants. We reverse, however, the trial court's ruling as it relates to Key Pharmaceuticals, Inc., as it is based on an incorrect interpretation of RCW 4.16.190.

CALLOW, C.J., and BRACHTENBACH, DOLLIVER, PEARSON, ANDERSEN, and DURHAM, JJ., concur.

DORE, J. (concurring in part, dissenting in part)—I dissent.

While I agree with the majority that the appointment of a guardian ad litem for Devan Young did not remove his disability for the purposes of the tolling statute (RCW 4.16.190) and that the applicable statute of limitations did not begin to run against him, I dissent from the majority's conclusion regarding summary judgment. The evidence before the trial court was sufficient to show the existence of a genuine issue of material fact. The majority fails to state the facts in full and misapplies the standards governing summary judgment. I would reverse the trial court and remand for trial.

### FACTS

Plaintiff Devan Young was treated by doctors Ronald L. Case and C. Warren Bierman at Children's Orthopedic Hospital and Medical Center for an acute asthma condition. As treatment for Devan's asthma, Dr. Case prescribed the drug theophylline. The optimal therapeutic range of theophylline is 10 to 20. Blood levels under 10 are not sufficient to treat asthma, while blood levels over 20 are toxic or potentially toxic and can lead to brain damage or death. Because proper levels of the medication are critical to safe, effective treatment with the drug, blood samples must be

drawn in order to monitor dosage levels soon after medication is taken. How soon after is an issue in this case.

In September 1978, Dr. Case prescribed the theophylline preparation Theo–Dur, 200 mg twice daily. The record indicates that Devan's Theo–Dur dosage was increased to 300 mg twice daily. On January 26, 1979, Devan's theophylline blood level was tested at 11.8, approximately 10 hours after he had been given Theo–Dur. Early in the morning on February 1, 1979, Devan, then 3 years old, was admitted to the Hospital with a theophylline blood level of 68 which resulted in permanent brain damage and rendered him mentally incompetent. He will need custodial care for the rest of his life.

On April 26, 1982, E. Rosa Young was appointed her son's guardian ad litem. In June 1986, she filed this medical malpractice and products liability action in King County Superior Court, naming the Hospital, the treating physicians and the pharmaceutical company as defendants. The guardian alleged that the Hospital and the treating physicians were negligent in their treatment of her son and that the pharmaceutical company was negligent in the labeling and warning with respect to the use of Theo–Dur.

The defendants moved for summary judgment. In an affidavit accompanying the motion for summary judgment, Dr. Case, the treating physician, states that in September 1978, he prescribed Theo–Dur 200 mg twice daily, and that he saw Devan again on November 1, 1978. Dr. Case did not see Devan again until January 31, 1979, the day before Devan suffered a seizure. Dr. Case's affidavit presumes that Theo–Dur 400 mg a day was continued throughout Devan's care period. Based on a Theo–Dur dosage of 400 mg a day, Dr. Case states that Devan's care "was at all times consistent with that of a reasonably prudent allergy and immunology practitioner under similar circumstances." Clerk's Papers, at 58.

In response to the defendants' motion, the plaintiff submitted the affidavit of Stephanie Dotson, a registered pharmacist. Dotson's affidavit points out that, according to the

Hospital's records, the allergy clinic increased Devan's Theo–Dur dosage to 300 mg twice daily in mid–January 1979. See Clerk's Papers, at 119, 131, 133. In other words, Devan was receiving 600 mg per day in the period just prior to his seizure. Dotson also stated that, according to the professional literature, the maximum dosage for a child Devan's age is 400 mg per day.

In connection with their reply brief on the summary judgment motion, the defendants submitted a second affidavit by Dr. Case and an affidavit by Dr. John Neff, the Hospital's Chief of Staff. In his response to Dotson's affidavit, Dr. Case conceded that she was correct in her statement as to the recommended dosage.

Dr. Neff's affidavit is predicated on the Hospital records of Devan's treatment. As Dotson pointed out, these records show that the allergy clinic increased Devan's Theo–Dur dosage to 600 mg a day shortly before he suffered a seizure. On the basis of these facts, Dr. Neff opines that "[t]he physicians and other staff at Children's Orthopedic Hospital, in their care of Devan Young, exercised that degree of skill, care and learning which was available in the pertinent geographic area at the time of Devan Young's care." Clerk's Papers, at 81.

Although both doctors conclude that the appropriate standard of care was met, it is important to note that they disagree about a key factual predicate of their common conclusion. Doctor Case bases his conclusion on the assumption that Devan received a dosage of 400 mg per day. Doctor Neff, relying on the Hospital records, assumes that Devan received a dosage of 600 mg per day.

The trial court granted summary judgment, holding that the plaintiff's medical malpractice and products liability claims were barred by the applicable statute of limitations. The trial court also ruled that a pharmacist's affidavit submitted in opposition to the health care defendants' summary judgment motions failed to raise a genuine issue of material fact regarding whether the treating physicians or the Hospital breached the standard of care.

I would reverse the trial court on the ground that the two doctors' own affidavits raised an issue of material fact. Furthermore, Dotson's affidavit was sufficient to raise an issue of fact over the proper monitoring of Devan's blood levels, based on facts as to which she was competent to testify.

### STANDARDS GOVERNING MOTIONS
### FOR SUMMARY JUDGMENT

Even aside from its errors regarding the facts and the competence of the pharmacist's affidavit, the majority misapplies the standards of summary judgment by weighing the respective affidavits of the defendants and the plaintiff.

On review of a summary judgment, an appellate court must consider the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment can be granted only when the pleadings and the evidence:

> show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

CR 56(c). A "material fact" is a fact upon which the litigation depends, in whole or in part. *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 643, 618 P.2d 96 (1980). Once the moving party has made and supported his motion, the nonmoving party must come forward with specific facts showing that a genuine issue of fact exists for trial. CR 56(e).

The respective burdens imposed on the moving and nonmoving party by CR 56 are sometimes confusing. Two related points must be kept in mind. First, while the defendant moving for summary judgment is not required to submit affidavits in support of his motion, CR 56(b), this does not mean he does not bear a genuine and substantial burden in supporting his motion. While CR 56(e) requires the nonmoving party to come forward with facts showing a material issue of fact, this does not occur unless and until the defendant meets his initial burden of showing that there is no issue of material fact.

Initially the burden is on the party moving for summary judgment to prove by uncontroverted facts that there is no genuine issue of material fact. *LaPlante v. State,* [85 Wn.2d 154, 531 P.2d 299 (1975)] at 158; *Rossiter v. Moore,* 59 Wn.2d 722, 370 P.2d 250 (1962); 6 J. Moore, *Federal Practice* ¶ 56.07, ¶ 56.15[3] (2d ed. 1948). If the moving party does not sustain that burden, summary judgment should not be entered, *irrespective of whether the nonmoving party has submitted affidavits or other materials. Preston v. Duncan,* [55 Wn.2d 678, 681, 349 P.2d 605 (1960)] at 683, *see also* Trautman, *Motions for Summary Judgment: Their Use and Effect in Washington,* 45 Wash. L. Rev. 1, 15 (1970).

(Italics mine.) *Jacobsen v. State,* 89 Wn.2d 104, 108, 569 P.2d 1152 (1977); *accord, Zamora v. Mobil Oil Corp.,* 104 Wn.2d 199, 208–09, 704 P.2d 584 (1985); *Graves v. P.J. Taggares Co.,* 94 Wn.2d 298, 302, 616 P.2d 1223 (1980).

Second, it is important to note that the affidavit performs a radically different function in the defendant's case as opposed to the plaintiff's. A plaintiff, if he is the nonmoving party, must create an issue of fact in order to avoid summary judgment and an affidavit asserting *any* supportable, relevant fact inconsistent with the defendant's position will be sufficient to do so. The defendant's task, to show that there are *no* disputed facts, is necessarily much more difficult. In contrast to the plaintiff's situation, the mere fact that the defendant does assert some relevant facts will not necessarily meet his burden. The defendant's task of showing that there are *no* disputed facts means that the facts asserted in his affidavit, together with the plaintiff's allegations taken as true, must support *only* inferences in the defendant's favor.

Consequently, there is a risk inherent in the defendant's submitting affidavits. When more facts are added to the equation, the range of possible inferences multiplies. Some of the possible inferences may be inconsistent, resulting in the presentation of a jury question. There is no reason to assume, as the majority seems to, that merely because the affidavits are the defendant's that they resolve all factual disputes in his favor. See majority, at 226–27. Clearly, the

affidavits are just as likely to expose further conflicts in the evidence, making it all the more necessary to send the matter to the jury to decide.

In treating the defendants' affidavits as dispositive, the majority treats the burdens of the parties on summary judgment as burdens of proof, weighing the defendants' affidavits against the plaintiff's. However, CR 56(e) describes only a shift in the burden of presentation. *See* 9 J. Wigmore, *Evidence* § 2487, at 292–99 (1981). The rule requires only that the plaintiff come forward with some fact, *any* fact, relevant to the outcome of the case, which contradicts the defendant's position. Were the court to weigh the persuasiveness of the facts asserted by the plaintiff and defendant, it would infringe on the province of the jury. If any party can be said to have the burden of proof on the motion, it is the defendant, since the evidence is strictly construed against him in order to prevent the court from usurping the jury's fact–finding role.

The case of *Celotex Corp. v. Catrett,* 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), cited by the majority, is not to the contrary. In *Celotex,* the plaintiff argued that the defendant must submit affidavits in support of his motion for summary judgment. The Court of Appeals agreed, but the Supreme Court reversed. The Court noted that the rule specifically states that the defendant may move for summary judgment *"with or without supporting affidavits"*. *Celotex,* at 323. The issue is whether there is no genuine issue of material fact, and a defendant may demonstrate this solely by reference to the pleadings. It is only the plaintiff who has a duty to submit affidavits, once the defendant has successfully supported his motion as provided in subsection (b) of the rule.

Contrary to the majority's suggestion, however, *Celotex* does not hold that just any affidavit submitted by the defendant will be sufficient to meet his burden. If the defendant chooses to argue from the pleadings, he must be able to show that all possible inferences from those pleadings are to his favor. If the defendant does submit affidavits, they too must lead only to inferences in his favor. If,

instead, it is possible to draw *any* inference in the plaintiff's favor, then to grant judgment to the defendant would be to usurp the role of the jury. It is indeed necessary for the defendant to disprove the plaintiff's claim on summary judgment; not in the sense that his evidence must be more persuasive than the plaintiff's, but in the sense that the defendant must show the plaintiff does not have a leg to stand on.

These points are well illustrated in *Zamora*. In that case the plaintiff argued that the defendant had failed to odorize its propane gas and that a gas explosion was proximately caused by this failure. The defendant submitted affidavits in which it asserted that the gas had been odorized in compliance with industry practice and applicable regulations. This court held that the defendant was not entitled to summary judgment because its affidavits did not lead solely to inferences in its favor. In the court's words, the defendant's affidavits did not conclusively establish the absence of proximate cause.

> The respondent proved only that the gas was odorized in compliance with industry standards and an administrative safety regulation; such compliance, however, does not *conclusively establish* that the gas was adequately odorized. Rather, that evidence is merely relevant on the issue of proximate cause. Respondent, in moving for summary judgment, had the burden of proof that no genuine issue of material fact existed on the question of proximate cause. Because respondent's evidence of compliance with the safety standards does not conclusively establish absence of proximate cause, appellants are entitled to a trial on that issue as an element of their product liability claim.

(Citations omitted.) *Zamora*, at 208–09. In this case summary judgment is likewise not proper because the defendants' affidavits did not conclusively establish that their care met the required standard and that their failures were not the cause of Devan's injuries. On the contrary, the defendants' own affidavits undercut their motion.

## Summary Judgment Was Not Appropriate
## in This Case

In a medical malpractice action, a plaintiff must establish that (1) a health care provider failed to exercise the degree of care of a reasonably prudent health care provider acting in the same or similar circumstances, and (2) such failure was the proximate cause of injury. RCW 7.70.040. At issue is whether the health care defendants' administration and monitoring of Devan's Theo–Dur dosage breached the standard of care and whether the prescribed dosage proximately caused Devan's injuries.

The defendants themselves created an issue of fact over whether Devan was given the proper dosage of Theo–Dur. Dr. Case stated that a dosage of 400 mg falls within the standard of due care. Dr. Neff stated that the treating physicians met the standard of due care, but based his conclusion on the assumption that Devan was receiving 600 mg of Theo–Dur. The majority contends that the two doctors' conclusions are consistent, despite the fact that each opinion was premised on a different dosage, since there may be a range of dosages consistent with due care. However, *that contention in itself constitutes an issue of fact sufficient to preclude summary judgment.* Is it true that dosages of 400 and 600 mg both fall within the range of dosages consistent with due care? We do not know, and on the defendants' motion for summary judgment, we are required to construe conflicting evidence in the plaintiff's favor. The doctors' affidavits raise a question of material fact as to whether Devan received a dosage which was within the standard of due care.

There is also a question of fact whether the dosage received by Devan was the proximate cause of his injuries. The defendants concede that Theo–Dur, 400 mg a day is the recommended dosage for a child of Devan's age and weight. A dosage of 600 mg a day is 50 percent more than the recommended *maximum* daily dosage and 83 percent more than the recommended maintenance daily dosage for a child of Devan's age and weight. Devan's theophylline blood level increased to toxic levels shortly after his Theo–

Dur dosage was increased to 600 mg a day. Dr. Case in his second affidavit states that it is not unusual for children to be "high metabolizers" of theophylline, thus requiring more than the recommended dosage. However, he does not state that Devan is a "high metabolizer" or that prescribing a Theo–Dur dosage 50 percent higher than the recommended maximum daily dosage was warranted in this case. Therefore an issue of material fact exists on the question of proximate cause.

In short, the defendants' own affidavits undercut their motion for summary judgment because they do not conclusively establish that the defendants met the required standard of care or the absence of proximate cause. From the affidavits the defendants offered, together with the plaintiff's allegations taken as true, it is possible to conclude that Devan received a dosage outside the standard of due care, and that this caused his injuries. The majority's clever manipulation of events leaves a false impression as to the facts, which is unfair to Devan and his mother. The defendants clearly were not entitled to summary judgment, because they did not succeed in establishing that there was no issue of material fact left for the jury to resolve.

### THE PHARMACIST'S AFFIDAVIT RAISES ISSUES OF MATERIAL FACT REGARDING DUE CARE

An issue of fact also exists over the proper monitoring of Devan's blood level. The pharmacist's affidavit states that Theo–Dur requires frequent monitoring due to its high potential for toxicity, and that blood levels should be drawn 4 to 6 hours after a dosage is administered. As noted above, on the day before his seizure, Devan's blood was tested some 10 hours after the administration of the drug. If the pharmacist is correct, that test would have been ineffective to determine the proper level of Theo–Dur in the bloodstream. Furthermore, Dotson's affidavit pointed out that the Hospital records showed Devan had received 600 mg of Theo–Dur and that the recommended dosage for a child of his age is 400 mg. If the pharmacist is correct, the failure to monitor would have been a cause of Devan's injury.

In rejecting *Dotson's testimony as incompetent,* the majority fails to recognize that, regardless of Dotson's capacity to offer an opinion on the physician's standard of due care, she was competent to testify as to these facts. Dotson is a registered pharmacist in the state of Washington with extensive education, training and knowledge in her field. RCW 18.64.011(11) defines the practice of pharmacy:

> "Practice of pharmacy" includes the practice of and responsibility for: Interpreting prescription orders; the compounding, dispensing, labeling, administering, and distributing of drugs and devices; *the monitoring of drug therapy and use;* the initiating or modifying of drug therapy in accordance with written guidelines . . . the providing of information on legend drugs[3] which may include, but is not limited to, *the advising of therapeutic values, hazards, and the uses of drugs and devices.*

(Italics mine.) Dotson had examined the records, the authenticity of which the defendants never questioned, and she was competent by training and experience to offer an expert opinion on the contents of the professional pharmaceutical literature. In addition, in his response to Dotson's affidavit, Dr. Case conceded that she was correct in her statement as to the recommended dosage.

In response to Dotson's affidavit, Dr. Case submitted an affidavit in which he contended that the levels of medication need not be monitored in the 4– to 6–hour period, because: "A clinician can accurately determine a patient's theophylline medication (Theo–Dur) does [*sic*] by evaluating his peak, through or in between levels."

Here again, Dr. Case created issues of fact with his own affidavit. Is the proper monitoring period 4 to 6 hours, as Dotson states, or is the monitoring period longer, as Dr. Case contends. If that question is resolved in the plaintiff's favor, there is a question of fact whether defendants were negligent in performing blood toxicity tests outside the recommended time period. Therefore, even assuming that

---

[3]"Legend drugs" are defined as "any drugs which are required by any applicable federal or state law or regulation to be dispensed on prescription only or are restricted to use by practitioners only." RCW 18.64.011(6).

Dotson was not competent to offer an opinion on the physician's standard of due care, those facts as to which she was competent to testify did raise issues of fact sufficient to preclude summary judgment.

The majority clearly errs in holding Dotson's affidavit insufficient on the sole ground that she is a pharmacist. In addition to her statements regarding the Hospital records and the professional pharmaceutical literature, Dotson avers that through her education, background, training, and experience she is familiar with the standard of care in treating patients such as Devan. Based on her review of Devan's medical records, she states:

> The moving defendants failed to exercise that degree of skill, care and learning required of health care providers such as themselves in both prescribing theophylline and in monitoring its blood levels. This failure resulted in Devan experiencing theophylline toxicity.

Clerk's Papers, at 118.

In *Harris v. Groth*, 99 Wn.2d 438, 449, 663 P.2d 113 (1983), we refused to adopt a per se rule that nonphysicians are disqualified from offering expert testimony in a medical malpractice action. We stated:

> The witness need not possess the academic credentials of an expert; practical experience may suffice. Training in a related field or academic background alone may also be sufficient. [ER] 702 states very broadly that the witness may qualify as an expert by virtue of knowledge, skill, experience, training, *or* education.

*Harris*, at 449 (quoting 5A K. Tegland, Wash. Prac., *Evidence* § 289, at 26 (2d ed. 1982)). We further stated:

> We agree with the late Dean Wigmore that "the line between chemistry, biology, and medicine is too indefinite to admit of a practicable separation of topics and witnesses".

*Harris*, at 450 (quoting 2 J. Wigmore, *Evidence* § 569, at 790 (rev. 1979)). Whether an expert is licensed to practice medicine is an important, but not a dispositive factor to be considered by the trial court. *Harris*, at 450–51.

An affidavit submitted to avoid summary judgment must (1) be made on personal knowledge, (2) set forth such facts as would be admissible in evidence, and (3) affirmatively show that the affiant is competent to testify to the matters therein. CR 56(e). The trial court is vested with discretion to determine whether a witness is competent to testify as an expert on a particular subject and its ruling will not be disturbed except for a manifest abuse of discretion. *Orion Corp. v. State,* 103 Wn.2d 441, 462, 693 P.2d 1369 (1985); *see Harris,* at 450.

In light of the trend in Washington to permit nonphysicians to testify in malpractice actions, a trial court in the exercise of its discretion must be lenient toward a nonphysician's affidavit presented by the *nonmoving* party at a summary judgment proceeding. *See PUD 1 v. WPPSS,* 104 Wn.2d 353, 361, 705 P.2d 1195, 713 P.2d 1109 (1985). Accordingly, on a motion for summary judgment, the test is whether any trial judge would admit the expert testimony. Contrary to the majority's conclusion, we cannot say, as a matter of law, that no trial court would consider the pharmacist's affidavit.

Our function at this stage is not to decide whether Dr. Case is more persuasive than Dotson, but only to decide whether there is a disputed question of material fact. Clearly, the conflicting affidavits of Dotson and Case on this point do raise a question as to whether the health care defendants' monitoring of Devan's theophylline levels breached the standard of care. The trial court abused its discretion in ruling, as a matter of law, that the affidavit was insufficient to create an issue of material fact.

### CONCLUSION

The evidence introduced by Doctors Case and Neff failed to show that no genuine issue of material fact exists for trial. Material questions of fact exist as to whether prescribing Theo–Dur 400 mg a day or Theo–Dur 600 mg a day is consistent with the standard of care and whether prescribing Theo–Dur 600 mg a day proximately caused toxic levels of theophylline to accumulate in Devan's blood. The affidavits raise material questions of fact as to whether the

health care defendants monitored Devan's theophylline levels within the required time period or whether, instead, they breached the standard of care.

I would reverse the judgment and remand for trial.

Reconsideration denied May 31, 1989.