**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| LINDA J. ACOSTA, | No.  52953-0-II |
| Appellant, | |
| v. | |
| WASHINGTON STATE DEPARTMENT OF CORRECTIONS, | UNPUBLISHED OPINION |
| Respondent. | |

WORSWICK, J. — Linda Acosta appeals an order granting summary judgment dismissal of her medical negligence lawsuit against the Department of Corrections (DOC) arising out of the DOC's delay in allowing Acosta to obtain a medical diagnostic test and subsequent back surgery. She argues that res ipsa loquitur applies, thus, expert testimony was not necessary to a determination that the DOC departed from the standard of reasonable, prudent, and appropriate medical care.  We disagree and affirm the summary judgment order.

FACTS

I.  BACKGROUND

Linda Acosta is currently a 71-year old inmate at the Washington Corrections Center for Women.  During her time in incarceration, she has been diagnosed and treated for a multitude of illnesses.  Acosta's medical history includes osteoporosis, degenerative disk disease, and degenerative arthritis in the joints of the spine.

In October 2014, Acosta tripped on a floor mat, fell backward, and suffered an injury to her back.  Acosta experienced extreme pain in her right lower back which radiated down to her

knee. On November 7, Acosta visited the DOC's health clinic where she reported to the DOC advanced registered nurse practitioner Pamelyn Saari that she was unable to get out of bed. Acosta was in a wheelchair and could not walk more than 10 feet because of her injury. Saari explained to Acosta that she should get out of the wheelchair, but reluctantly allowed Acosta to continue its use.

On November 13, Acosta underwent an X-ray which revealed a compressed fracture of her L1 vertebra with over 50 percent loss of the vertebral body. Soon after the X-ray, Acosta requested to see an orthopedic surgeon. Saari explained that she was treating Acosta conservatively. Saari said that she had prescribed medications to treat Acosta's osteoporosis, and that Saari did not believe that an orthopedist would do anything differently. On December 30, Acosta returned to the DOC medical clinic complaining of severe pain in her lower back. DOC medical personnel instructed Acosta to apply ice, walk, and take anti-inflammatories. The next day, Acosta again appeared at the DOC clinic where she declared that she was in a "[m]edical emergency" for pain and inability to stand. Clerk's Papers at 171. She was given Tylenol and an ice pack and referred to physical therapy.

Acosta began requesting an MRI (magnetic resonance imaging) in January 2015, which she intended to pay for herself. The DOC has a process for self-paid medical care that involves a series of specific steps that must be taken by an inmate, including filing paperwork, gathering medical information, paying a processing fee, and depositing the funds necessary to cover the cost of the procedure or appointment. Offenders cannot independently decide or elect to have

medical services performed at their will during incarceration. The DOC permits a self-pay medical procedure or appointment only if it is "medically appropriate."[1] CP at 445.

Between January 2015 and April 2015, Acosta sent multiple health services kites[2] to DOC staff, each containing some reference to or inquiry about her MRI appointment. In February, Acosta sent kites to Saari requesting an accommodation for meals and for a wheelchair, but Saari denied her requests, explaining that Acosta needed to continue movement.

Acosta sent multiple kites to Saari in March. Saari replied to all of Acosta's kites on March 25. Acosta's March 16 kite inquired whether TRA[3] had supplied information on the cost of her MRI, and Saari responded that she "[did not] know." CP at 284. Acosta's March 19 kite again inquired if the DOC had received information on her requested MRI. Saari replied, "I don't know. We told the TRA people about your spine (L spine) and hip areas that need attention. I have not heard a thing." CP at 285. Acosta's March 24 kite again requested the status of her MRI. Saari replied that she had "reported the body parts that are requested to be screened," but she had not heard back. CP at 286.

In May, DOC staff sent Acosta an initial cost estimate obtained from an outside medical provider. Between June and September, Acosta sent four additional kites to DOC staff

---

[1] Policy number DOC 600.020, titled "Offender-Paid Health Care," lists criteria for determining what is "medically appropriate," which requires that the requested service not be provided under the offender health plan, and the likely benefits outweigh the risks of the requested service.

[2] A "kite" is a form used in prison for communication from inmates to prison staff. *State v. Puapuaga*, 164 Wn.2d 515, 518 n.2, 192 P.3d 360 (2008).

[3] "TRA" refers to TRA Medical Imaging, the independent medical imaging company that provided services to the DOC.

requesting the status of her MRI request. In July, Saari told Acosta that an MRI could be as low as $1,650, that she had sent estimates for the other sites, and that Acosta should begin depositing funds into a medical account.

On September 11, Acosta submitted an offender complaint, alleging that the DOC was nonresponsive to her requests for an MRI. On September 16, DOC staff responded to the complaint stating, "Ms. Acosta, as soon as DOC publishes the new policy, we will get you sent out." CP at 409. The DOC offender-paid health care policy was revised on September 21 and outlined the necessary process for approval of self-paid medical services. On September 21, Acosta completed and submitted a worksheet in accordance with that policy. The DOC finally scheduled Acosta's MRI in October.

On November 24, Acosta's MRI was performed, and DOC physician Mary Colter then requested Acosta receive an outside surgical consult with recommended treatment. A DOC Care Review Committee Report dated November 11 stated, in part:

> ". . . L-spine MRI indicating she may need urgent decompression, per Radiologist. . . . [January] X-ray findings reviewed by DOC Ortho and discussed. Per DOC Ortho, she needs surgical consultation regardless of physical symptoms. . . .
>
> **Intervention Proposed:** surgical consultation with treatment as indicated.

CP at 294.

In December, Acosta saw a neurosurgeon, Dr. Marc Goldman, for a surgery consultation related to her L1 compression fracture. In his report, Dr. Goldman stated, "[G]iven the chronicity of this there is no urgency in treatment." CP at 253. In January 2016, Acosta had a CT (computed tomography) scan of her spine. In February, Acosta saw Dr. Goldman for a

follow up.  Dr. Goldman was unsure that surgery would be beneficial and sought a second opinion.

In March, Acosta received an assessment and a second surgical opinion from Dr. Michael Martin and physician assistant Nicholas Harrison.  Dr. Martin recommended surgery. Saari then called Dr. Martin's office and sent an e-mail to schedule Acosta's surgery.  On April 3, Acosta sent a kite to the DOC asking if her surgery had been scheduled, complaining that her pain was increasing and that she could not sleep.  On April 5, Saari replied, "You are scheduled."[4]  CP at 393.  On April 7 and April 9, Acosta again inquired about her scheduled surgery, and DOC Health Services Manager Jeff Perry replied that Acosta was going to receive additional imaging.

On April 12, Acosta saw Dr. Colter, complaining of chronic low back pain.  Dr. Colter prescribed Acosta narcotic pain medication.  Acosta sent five additional kites between April 13 and May 3 requesting notice that her surgery had been scheduled, and DOC staff replied that they were calling the surgeon's scheduler every day, and that her surgery was a priority.  Acosta filed a grievance on April 20, complaining of the delay in scheduling her surgery.  A DOC grievance coordinator responded on May 6, stating, "I think we have made some progress with your case.  Both Dr. Colter and Dr. Anderson[5] are now involved and have been able to make contact with Dr. Martin's surgery scheduler."  CP at 414.

On May 4, Acosta underwent a preoperation assessment and evaluation.  Before surgery, Acosta's pain prevented her from performing daily activities such as walking, bathing, dressing

---

[4] It appears from the record that the surgery was not scheduled at this time.

[5] Dr. Mary Lee Colter and Dr. Lisa Longano Anderson are DOC physicians.

or using the restroom. She needed assistance from others to carry out these tasks. On June 7, Acosta underwent spinal surgery for her Ll compression fracture. After surgery, Acosta's back pain substantially diminished, to where she was able to walk with a walker, and take care of her personal needs.

## II. PROCEDURAL HISTORY

Acosta filed a medical negligence lawsuit against the DOC related to the treatment she received from the DOC. The DOC filed a motion for summary judgment, arguing that Acosta could not establish that the medical staff violated the standard of care nor could she establish causation. The DOC submitted declarations from Dr. Colter and Dr. Bede in support of its motion. The declarations from Dr. Colter and Dr. Bede described all of Acosta's medical conditions the DOC was treating, explained the offender-paid health care policy, and opined that DOC medical staff did not violate the standard of care. Dr. Bede declared that an MRI was an appropriate action only after Acosta did not respond to initial conservative treatment. Finally, Dr. Bede opined that no permanent injury was caused to Acosta due to the action or any action of DOC medical personnel.

Acosta did not submit expert testimony, but instead argued that the doctrine of res ipsa loquitur applied to her case. As a reply to the res ipsa loquitur argument, the DOC submitted additional testimony of Dr. Colter relating the offender-paid healthcare procedures and process. The trial court granted the DOC's motion, ruling that the doctrine of res ipsa loquitur did not apply.

Acosta appeals the trial court's order granting summary judgment dismissal.

No. 52953-0-II

## ANALYSIS

### I. STANDARDS OF REVIEW

We review a grant of summary judgment de novo, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015). Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. CR 56(c); *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 140, 960 P.2d 919 (1998). The defendant may meet this burden by challenging the sufficiency of the plaintiff's evidence. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). Whether res ipsa loquitur applies in a given circumstance is a question of law reviewed de novo. *Curtis v. Lein*, 169 Wn.2d 884, 889, 239 P.3d 1078 (2010).

### II. LEGAL PRINCIPLES

#### 1. *Statutory Requirements for Medical Malpractice*

In Washington, actions for injuries resulting from health care are governed under chapter 7.70 RCW. To prevail on their claims, plaintiffs must prove

> (1) [t]he health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances;
>
> (2) Such failure was a proximate cause of the injury complained of.

RCW 7.70.040.

#### 2. *Expert Testimony Required To Establish Standard of Care and Causation*

In a medical negligence action, expert testimony is generally necessary to establish that the health care provider failed to exercise the standard of care of a reasonably prudent health care

7

provider. *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 232, 393 P.3d 776 (2017). However, the plaintiff can meet this burden by showing that the doctrine of res ipsa loquitur applies. *See Miller v. Jacoby*, 145 Wn.2d 65, 33 P.3d 68 (2001) (holding that expert medical testimony was not required to establish that nurse and physician were negligent in failing to completely remove Penrose drain from patient during postoperative procedure). That is, when medical facts are "'observable by [a layperson's] senses and describable without medical training,'" a plaintiff can establish the standard of care for a health care provider without expert testimony. *Miller*, 145 Wn.2d 65 at 72 (quoting *Bennett v. Dep't of Labor & Indus.*, 95 Wn.2d 531, 533, 627 P.2d 104 (1981)).

Expert testimony is also required to establish causation in a medical negligence case. *Frausto*, 188 Wn. 2d at 232. "Like the standard of care, expert testimony is always required except in those few situations where understanding causation 'does not require technical medical expertise.'" *Frausto*, 188 Wn.2d at 232 (quoting *Young*, 112 Wn.2d at 228). Here, it is undisputed that Acosta failed to submit expert testimony to establish either negligence or causation. Instead, she relies on the doctrine of res ipsa loquitur to establish the first element, and her personal testimony to establish the second.

### III. RES IPSA LOQUITUR DOES NOT APPLY

Acosta argues that res ipsa loquitur applies because the DOC's delay in scheduling her MRI and surgery would not have occurred in the absence of negligence. In making this argument, she is defining the "occurrence producing the injury" as the DOC's *delay* in obtaining her MRI. Br. of Appellant at 9 (quoting *Miller*, 145. Wn.2d at 65). Conversely, the DOC argues that its medical treatment was not of a kind that ordinarily does not happen absent negligence. In

making this argument, the DOC is defining the "occurrence" as the DOC's *medical treatment of Acosta's injured back*. We agree with the DOC.

To prevail on a complaint for medical negligence, a plaintiff must satisfy traditional tort elements of proof: duty, breach, injury, and proximate cause. *Dunnington v. Virginia Mason Med. Ctr.*, 187 Wn.2d 629, 636, 389 P.3d 498 (2017). The doctrine of res ipsa loquitur provides a fact finder with an inference of the defendant's breach of duty, thus allowing a plaintiff to establish a prima facie case of negligence when he cannot prove a specific act of negligence. *Brugh* v. *Fun-Tastic Rides Co.*, 8 Wn. App. 2d 176, 180, 437 P.3d 751 (2019).

Under some circumstances, the doctrine of res ipsa loquitur can apply to physicians and hospitals. *ZeBarth v. Swedish Hosp. Med. Ctr.*, 81 Wn.2d 12, 18, 499 P.2d 1 (1972). Res ipsa loquitur is "ordinarily sparingly applied, 'in peculiar and exceptional cases, and only where the facts and the demands of justice make its application essential.'" *Curtis*, 169 Wn.2d at 889 (internal quotation marks omitted) (quoting *Tinder v. Nordstrom, Inc.*, 84 Wn. App. 787, 792, 929 P.2d 1209 (1997)).

The doctrine applies only when the evidence shows:

> (1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff.

*Pacheco v. Ames*, 149 Wn.2d 431, 436, 69 P.3d 324 (2003).

The first element is satisfied if one of three conditions is present:

> (1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, i.e., leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be

expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.

*Zukowsky v. Brown*, 79 Wn.2d 586, 595, 488 P.2d 269 (1971)).

The second element, exclusive control, includes situations when the defendant has the right of control, as in a nondelegable duty, as when the defendant has actual physical control of the agency. *Hogland v. Klein*, 49 Wn.2d 216, 219, 298 P.2d 1099 (1956).

The third element requires the court to consider whether the plaintiff's injury was due to her voluntary action or inaction. *Zukowsky*, 79 Wn.2d at 595. This element can include plaintiff's negligence or assumption of the risk. *Zukowsky*, *79* Wn.2d at 595.

1. *Accident or Occurrence Producing the Injury of a Kind Which Ordinarily Does Not Happen in the Absence of Someone's Negligence*

To apply res ipsa loquitur, the evidence has to show that that the occurrence producing Acosta's injury is of the type which does not ordinarily occur in the absence of negligence. *Pacheco*, 149 Wn.2d at 436. Acosta can meet this element by meeting one of three conditions. Acosta appears to argue only the first two conditions: whether the act causing the injury is so palpably negligent that it may be inferred as a matter of law, and whether the general experience and observation of mankind teaches that the result would not be expected without negligence. Acosta meets neither condition.

Regarding the first condition, the evidence does not show that the occurrence producing her injury is of the type which does not ordinarily occur in the absence of negligence. As mentioned above, Acosta narrowly defines the "occurrence" as the DOC's delay in obtaining her MRI. This is too narrow a view. But even if we accept this argument at face value, the evidence does not show that a delay in obtaining a medical test is the type of occurrence that does not

10

ordinarily occur in the absence of negligence. To the contrary, there can be a multitude of reasons for the DOC's delay in obtaining a self-paid MRI.

For example, the evidence here shows that the MRI request required a DOC medical care staff member to deem it "medically appropriate" before it could be approved. Acosta argues that the delay here was caused by ineptitude and lies, but the particular facts regarding this delay are not determinative. Our focus in analyzing this element of res ipsa loquitur is whether *a delay* in obtaining a medical test is the type of occurrence that does not *normally occur* in the absence of negligence. It is not, and Acosta's argument fails on this point.

Viewing the issue as more properly framed by the DOC, that we consider all of the DOC's medical treatment for Acosta's injury, her failure of proof is even more evident. Acosta filed a medical malpractice action, which generally requires expert testimony that the medical care provider violated the applicable standard of care. *Frausto*, 188 Wn.2d at 232. Acosta makes no effort to argue that the DOC's medical treatment of her back injury is the type of occurrence that normally occurs in the absence of negligence. And a review of the evidence shows that the DOC's conservative treatment of her lumbar spine fracture is not the type of occurrence which ordinarily does not happen in the absence of negligence. In fact, the DOC submitted Dr. Bede's declaration showing that the DOC's actions in this regard were not negligent, but instead were within the standard of care in this case.

During the entire time in question, Acosta was receiving medical care for the fall she suffered in October 2014, and the record contains declarations from experts that describe that care as meeting the requisite standard of care for medical professionals. Her medical providers, the same people to review and possibly approve her MRI request, were unsure of the cause of her

11

pain or the benefit of surgery. These facts take this case out of the realm of "palpable negligence" where this doctrine would normally apply, i.e., drilling in the wrong side of a patient's jaw, leaving foreign objects in the body, or amputation of a wrong member. *Pacheco*, 149 Wn.2d at 438; *Zukowsky*, 79 Wn.2d at 595.

Nor does the evidence establish the second condition: whether the general experience and observation of mankind teaches that the result would not be expected without negligence. It is simply not within the general experience of mankind that the *result* claimed here—pain and suffering experienced prior to back surgery—would not be expected without negligence. Although Acosta appears to blame this result on the delay, our consideration of this condition looks to the injury, not the cause. *Brugh*, 8 Wn. App. 2d at 184.

We hold that the evidence does not show that the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence. Because Acosta fails on proving one of the necessary elements of the doctrine of res ipsa loquitur, the doctrine is not applicable in this case and we need not consider the sufficiency of the other required elements.

IV. SUMMARY JUDGMENT WAS PROPER

The DOC argues that the summary judgment dismissal was proper because Acosta did not provide expert testimony on the standard of care or causation. We agree.

1. *Standard of Care*

To establish the standard of care, Acosta must prove that "[t]he health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of

Washington, acting in the same or similar circumstances." RCW 7.70.040(1). Because res ipsa loquitur does not apply here, Acosta must prove this element with expert testimony. *Frausto*, 188 Wn.2d at 232. Acosta has offered no competent evidence about the standard of care in her case, thus, she has not raised an issue of material fact as to the standard of care.

2. *Causation*

Acosta argues, without citation to authority, that expert testimony is not required to prove causation in her case, and that she is qualified to testify to her pain and suffering. Acosta seems to argue that causation in her case falls within one of the narrow exceptional cases our Supreme Court discusses in *Young v. Key Pharmaceuticals, Inc.*, where "the determination of negligence does not require technical medical expertise." 112 Wn.2d at 228. We disagree.

To establish causation, the plaintiff must show that the alleged breach of the standard of care "was a proximate cause of the injury complained of." RCW 7.70.040(2). The exceptional cases mentioned by the Supreme Court in *Young* that "[do] not require technical medical expertise" include "amputating the wrong limb or poking a patient in the eye while stitching a wound on the face." 112 Wn.2d at 228. In *Young*, our Supreme Court held that lay testimony could be admitted "to show obvious impairments," and is "sometimes admissible for matters such as observations of health, disease, or injury," but that even a pharmacist was not competent to testify as to causation between a physician defendant's conduct and those observed impairments. 112 Wn.2d at 228.

Here, although Acosta's pain and suffering may be obvious to her, it is the causation of that pain and suffering that is at issue. Because Acosta has offered no competent evidence about

No. 52953-0-II

the proximate cause of the injury complained of, she has not raised an issue of material fact as to proximate cause.

## V. CONCLUSION

We hold that the doctrine of res ipsa loquitur does not apply, thus the evidence is not sufficient to raise genuine issues of material fact for each element of Acosta's claim. Moreover, Acosta failed to raise an issue of material fact as to proximate cause. Thus, trial court's summary judgment dismissal is affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

_____
Melnick, J.

_____
Sutton. A.C.J.

14