[No. 51443-1-I.   Division One.   October 25, 2004.]

DEBORAH S. HEG, *Respondent*, v. RALPH C. ALLDREDGE, ET AL., *Appellants*.

*Robert D. Johns* and *Duana T. Kolouskova* (of *Johns Monroe Mitsunaga, P.L.L.C.*), for appellants.

*Michael L. Charneski*, for respondent.

¶1 KENNEDY, J. — In this quiet title action, Ralph and Claudia Alldredge appeal the trial court's grant of summary judgment to Deborah Heg by which the trial court ruled that a recorded but unopened easement for ingress, egress, access, and road purposes is appurtenant to Heg's real property. The Alldredges contend that genuine issues of

material fact preclude summary judgment as to whether the easement was abandoned and, if a trier of fact should find that it has not been abandoned, as to whether Ms. Heg ought nevertheless to be equitably estopped from enforcing the easement. They also contend that the trial court erred by failing to specify that the scope of any rights Ms. Heg may have to utilize the easement in the future can be resolved only after weighing the relative hardships on the parties based on such facts as may exist at the time that actual use of the easement is proposed. We find there are material issues of fact as to whether the easement was abandoned. There is sufficient evidence in the record to support a finding of abandonment and to support equitable estoppel on one of the three theories presented by the Alldredges, though not on the other two. Accordingly, we reverse in part and affirm in part. And although it is unclear to us whether the trial court actually intended to preclude any future court review regarding the scope of Ms. Heg's potential future use of the easement in light of the relative hardship to the parties, to the extent that the trial court may have so intended, we modify the ruling to preserve those issues.

## FACTS

¶2 In the 1940s, a predecessor of the various Pope & Talbot, Inc., and Pope Resources entities that were named as defendants below subdivided property located on Whidbey Island that is bordered on the west by Admiralty Inlet, on the east by Smugglers Cove Road, and on the south by Whidbey Island State Park. The property was never formally platted, but was subdivided into parcels of various sizes having metes and bounds descriptions. Parcels A and B together contain approximately 22 acres and are now owned by the respondent Deborah Heg. Parcel B is a waterfront parcel; Parcel A fronts on Smugglers Cove Road, a county road. Parcels C and D together contain approximately 11 acres and are now owned by the appellants Ralph and Claudia Alldredge. Parcel D is a waterfront parcel; Parcel C fronts on the county road.

¶3 Parcels E, F, G, H, and I are waterfront parcels that are substantially smaller than Parcels A through D and are now owned by several of the Alldredges' neighbors to the south who were defendants below but who are not parties to this appeal.

¶4 By 1957, the Pope & Talbot predecessor that subdivided the land had sold most if not all of the parcels in the subdivision, though it retained ownership of two parcels referred to as Pope Tract 1 and Pope Tract 2. Pope Tract 1 is a 60-foot wide strip of land that extends from its point of beginning abutting Parcel A in a southeasterly direction to its point of termination abutting the State Park. Pope Tract 2 is a 40-foot wide strip that connects Pope Tract 1 to Smugglers Cove Road. Pope Tract 2 was opened as a roadway initially called McClement Road, but subsequently renamed Smugglers Lagoon Lane. The Alldredges and their neighbors to the south use Smugglers Lagoon Lane to access their properties. Pope Tract 1 has never been fully opened as a roadway although it apparently provides the means by which some of the neighbors reach their yards and driveways from Smugglers Lagoon Lane.

¶5 In January 1957, Pope & Talbot, Inc., recorded a Declaration of Easement containing the metes and bounds descriptions of Pope Tract 1 and Pope Tract 2, and containing the following operative language:

> This easement shall be for ingress, egress, access and road purposes. This easement shall vest in each owner of property which abuts upon the tracts of land hereinabove described and this easement shall be an easement running with the land both as to burden and benefit as to each such abutting tract.

Clerk's Papers at 336-38.[1]

---

[1] The operative language is ambiguous but, in the context of the record and as dictated by logic, it is clear that the dominant and servient estates created by this easement both lie entirely within the boundaries of the easement itself. That is to say, the grantor of an easement cannot burden property owned by his neighbor but can burden his own property for the benefit of his neighbor. The last sentence of the operative language would be clearer if the drafter had inserted a comma at the place we have marked by brackets in the last clause of the sentence: "this

¶6 Appendix A to this opinion, which is found at Clerk's Papers 345, depicts Parcels A through I and Pope Tracts 1 and 2 as configured in 1957 when the easement was granted. By then, Bayard Wheeler owned Parcels A and B, and a private road located in the interior of Parcel A provided Wheeler with access to Smugglers Cove Road. Although both Parcel A and Parcel B abutted on the easement, Wheeler never used or proposed to use the easement granted by Pope & Talbot.

¶7 In March 1967, Wheeler sold Parcels A and B to Donald Thomas on a real estate contract under which Thomas could obtain incremental deed releases "provided that a permanent easement, right of way or public road is provided to the waterfront portion of subject property." Clerk's Papers at 180. Wheeler's conveyance to Thomas made no mention of the Pope & Talbot easement. Thomas never used or proposed to use the easement granted by Pope & Talbot. As had Wheeler, Thomas used the road on Parcel A to get to and from Smugglers Cove Road. Thomas also placed a deep road cut across the portion of his property that abuts the dead end of the Pope & Talbot easement, leaving a four- to six-foot barrier between his property and the easement.

¶8 The Alldredges purchased Parcels C and D in 1989. That same year, Pope & Talbot quitclaimed to the Alldredges the portion of Pope Tract 1 that runs between Parcels C and D, thereby creating Parcel J. Thereafter, Pope & Talbot quitclaimed other portions of Pope Tract 1 to the owners of various other parcels abutting Tract 1. Pope & Talbot retained ownership of some portions of Pope Tract 1 and all of Pope Tract 2. These retained portions are called Parcel K.

¶9 Prior to the Alldredges' purchase, Parcels C, D, and J had been used only for timber purposes and were heavily wooded. The Alldredges cleared a home site and built a vacation cabin that they plan to convert to a permanent

easement shall be an easement running with the land both as to burden and benefit[,] as to each abutting tract." Clerk's Papers at 338.

home after Ralph Alldredge retires from his law practice in California. The Alldredges do not use Parcel J for road or driveway purposes; rather they have incorporated it into their yard by landscaping it. Although their cabin is located on Parcel D, their driveway is located on Parcel C and connects to Smugglers Lagoon Lane on Parcel C. The placement of their house indicates the contemplated use of Parcel J as part of the yard of the house, rather than as a road or driveway.

¶10 The portions of the 60-foot wide easement that Pope & Talbot quitclaimed to the Alldredges' neighbors to the south have also largely been incorporated into the yards of their respective homes. One neighbor to the south, the Sages, built a septic system, which the county permitted to be built on a portion of the easement. Given the location of the well that provides the Sages with their water, relocation of the mound that serves that system would be problematic, as well as extremely expensive.

¶11 In March 1993, Thomas sold Parcels A and B to Deborah Heg. The deed to Ms. Heg references the 1957 easement. Ms. Heg and her husband have invested in excess of $2 million in the acquisition, improvement, and landscaping of Parcels A and B. They reconfigured the private road on Parcel A leading to Smugglers Cove Road from a 1940s' style driveway to a curved and sweeping drive through the veritable park that they have created on Parcels A and B. The reconfigured and paved driveway serves both their residence on Parcel B and their guesthouse on Parcel A. Ms. Heg obtained approval for a boundary line adjustment increasing the size of Parcel B to nearly 5 acres and decreasing the size of Parcel A to approximately 17 acres. As a condition of approving this boundary line adjustment, the county required Ms. Heg to provide written confirmation that Parcel B will always have legal access across Parcel A to Smugglers Cove Road, and Ms. Heg complied with that requirement.

¶12 Ralph Alldredge and Deborah Heg spoke by telephone shortly before Ms. Heg purchased Parcels A and B.

Among the topics discussed was a boundary line adjustment between Parcels B and D. Within a year after Deborah Heg bought the parcels, Ralph Alldredge told the Hegs that he believed that the easement had never been intended to benefit Parcels A and B, but even if so intended, that he believed the easement had been abandoned by the prior owners of Parcels A and B. Apparently, this explanation was met with silence on the part of the Hegs.

¶13 A couple of unusually rainy seasons followed the Heg purchase, and water began to run downhill off the Alldredge property onto the Heg property. Deborah notified Ralph of the problem, and Ralph asked her to recommend someone to fix the problem. She did so, and the Alldredges hired the man she recommended. After assessing the situation, this person recommended a drainage system be built, part of it to be at a location that was within the confines of the easement, and part of it to be underground on the Heg side of the property line. The Hegs approved the location, and the drain was installed at a cost to the Alldredges of over $8,000.

¶14 Intermittently during the first few years after Deborah Heg purchased Parcels A and B, she and her husband and the Alldredges discussed a boundary line adjustment between Parcels B and D to more closely conform their respective boundaries to the topography of the land in the area where the easement abuts Parcels A, B and D. Deborah and her husband were aware of Ralph and Claudia's ongoing concerns about the easement, and the Hegs privately discussed with each other the possibility of giving up their easement rights or potential rights in exchange for the boundary line adjustment. Although they never made such a proposal to the Alldredges, Mr. Heg told Mr. Alldredge that he and Deborah had consulted with an attorney and believed they had easement rights that could be the basis for a lawsuit against the Alldredges if they were not willing to come to terms over the boundary line adjustment. Mr. Alldredge took this to mean that if they did come to terms, the Hegs would not make a claim of right to

use the easement, but he did not articulate this understanding to the Hegs.

¶15 The parties agreed to swap equal triangles of land in order to accomplish the boundary line adjustment. But then, Deborah Heg wrote Ralph and Claudia Alldredge telling them that in her opinion the two triangles, while equal or approximately equal in size, were not equal in value. She pointed to the property tax assessments on each of the parcels to illustrate her point, and she reminded the Alldredges that the greater part of the Alldredge triangle was located within Parcel J and was encumbered by the easement, whereas none of the Heg triangle was encumbered. And she reminded them that they had yet to take care of the fact that a portion of the Alldredges' drainage system was buried on the Heg side of the property line, within the triangle that would become Alldredge property in the course of the swap.

¶16 The Alldredges ultimately offered to pay the Hegs $2,000 over and above the swap of the triangles of land, the Hegs accepted that offer, and the deal was consummated. Appendix B to this opinion, which is found at Clerk's Papers 349, depicts the configuration of Parcels A through K following the quitclaim by Pope & Talbot of various portions of the easement area to the Alldredges and to various of their neighbors to the south, the boundary line adjustment between Parcels A and B, and the boundary line adjustment among Parcels B, D and J.

¶17 On November 21, 2001, Deborah Heg filed a complaint to quiet title to the easement, naming the Alldredges, several of their neighbors to the south whose properties abut the easement, and various Pope & Talbot entities as defendants. The Pope & Talbot defendants and certain of the neighbors were subsequently dismissed as parties defendant. None of the Alldredges' neighbors who remained parties at the time of the summary judgment have joined the Alldredges in this appeal.

¶18 During discovery, Deborah Heg explained that she is not certain whether she will ever seek to actually use the

easement, but that she wishes to preserve her ability to do so in case she should ever decide to sell Parcel A in a transaction by which she could obtain a higher price for Parcel A by giving up her easement rights there and substituting her easement rights across Parcels J and K to serve Parcel B.

¶19 On October 31, 2002, the trial court granted Deborah Heg's motion for summary judgment. The court ruled that the easement at issue is appurtenant to parcels A and B, that Deborah Heg is entitled to ingress, egress, access, and road use over and upon the easement area, that the defendants may not unreasonably interfere with Ms. Heg's reasonable exercise of her rights to the easement, that the defendants use the easement area for other than road purposes at their own risk, and that the Sages had encroached upon the easement area by placing the mound for their septic system on the easement.

¶20 This appeal followed. The Alldredges do not appeal the trial court's ruling that the easement was intended to benefit Parcels A and B; rather they appeal the court's rulings that the easement was never abandoned and that Ms. Heg is not equitably estopped from enforcing the easement. The Alldredges contend there are material issues of fact as to whether Ms. Heg abandoned the easement and the trial court erred in granting summary judgment.

## ANALYSIS

¶21 This court reviews a summary judgment order de novo, performing the same inquiry as the trial court. *Kruse v. Hemp*, 121 Wn.2d 715, 853 P.2d 1373 (1993). The court must consider the facts submitted and all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). A moving defendant may satisfy the initial burden by showing that there is an absence of evidence to support the nonmoving party's case. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225 n.1, 770 P.2d 182

(1989). The moving defendant need not submit affidavits but may instead support the motion by merely challenging the sufficiency of the plaintiff's evidence as to any material issue. *Young*, 112 Wn.2d at 226. In response, the nonmoving party may not rely on the allegations in the pleadings but must set forth specific facts by affidavit or otherwise that show a genuine issue exists. *Las v. Yellow Front Stores, Inc.*, 66 Wn. App. 196, 198, 831 P.2d 744 (1992). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Kruse*, 121 Wn.2d at 722; CR 56(c).

## Abandonment

■ ¶22 It is settled law in Washington that (absent a statute or contract provision to the contrary) mere non-use of an easement, standing alone, is not sufficient to establish abandonment, regardless of the lapse of time. *See, e.g., Thompson v. Smith*, 59 Wn. 2d 397, 407, 367 P.2d 798 (1962).

■ ¶23 Nevertheless, lapse of time is a factor for a trier of fact to consider in determining whether a grantee has abandoned the easement. *Cf., Neitzel v. Spokane Int'l Ry.*, 80 Wash. 30, 41, 141 P. 186 (1914).[2] Whether the grantee paid anything to acquire the easement is another factor to be considered, in that intention to abandon property rights for which one has paid value will not be presumed. *Id.* Placement by the grantee of a barrier rendering use of a right of way impossible or impractical will support a finding of abandonment. *Cf., N. Pac. Ry. v. Tacoma Junk Co.*, 138 Wash. 1, 244 P. 117 (1926) (a conversion case turning upon whether a railroad company had abandoned its right of way and the property left thereon by reason of nonuse and taking up of a portion of its track; *held*: nonuse alone

---

[2] Railway right-of-way cases are a special category of cases that often turn on statutory or common law principles peculiar to railways cases themselves. Thus, common law principles applicable in railway cases may or may not be applicable in street cases, and visa versa. Here, we utilize only those principles applicable to railway cases that are also applicable to street cases.

insufficient to prove abandonment but removal of the rails themselves sufficient to show abandonment of that portion of the spur from which the rails had actually been removed). Nonuse of a platted but never opened easement coupled with long term use of a substitute way will also support a finding of abandonment. *Barnhart v. Gold Run, Inc.*, 68 Wn. App. 417, 422-23, 843 P.2d 545 (1993).

¶24 The facts in the instant case bear considerable similarity to those in *Barnhart*. There, an easement was created as part of a platted development to provide access for use of the adjacent property owners, but the portion of the easement that was intended to serve Lot 31 was never opened. Instead, while Lots 29, 30 and 31 were in common ownership by one Ms. Harris, she built a house on Lot 30 that encroached on a portion of the unopened platted way and built a jeep road that did not follow the platted way but eventually connected up with it. The jeep road remained in use by successive owners of Lot 31 for some 40 years. By 1990, Barnhart owned Lot 31, and Karspeck owned Lot 30. Barnhart filed suit against Karspeck and others to determine Barnhart's interest in the platted but unopened way. The trial court determined that Barnhart had lost any right to the use of the unopened portion of the platted way but had acquired a prescriptive easement over the substitute way. The court of appeals affirmed.

¶25 The *Barnhart* majority reasoned that by building the jeep road, Ms. Harris clearly evidenced an intent to abandon the platted way. *Id.* at 422-23 (citing 1 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 15.46 at 15-25 (2d ed. 1986) (citing in turn *Schumacher v. Brand*, 72 Wash. 543, 546-47, 130 P. 1145 (1913)). Judge Sweeney agreed with this portion of the majority's analysis, but dissented on other grounds. *See* 68 Wn. App. at 425-26 (Sweeney, J., dissenting, but agreeing with the majority's conclusion that Ms. Harris abandoned the unopened platted way when she built the alternate route).

¶26 Here, Parcels A and B have remained in common ownership since the recording of the easement. The

portion of the recorded way that abuts Parcels A and B has never been opened and instead has been incorporated into the yards of the Alldredges and their neighbors to the south. Over the years, the successive common owners of Parcels A and B have constructed, reconfigured, and paved a roadway that serves both Parcels A and B. One of the owners, Wheeler, required his successor, Thomas, to contract to provide Parcel B with access to the county road across Parcel A as a condition of obtaining successive deed releases. Although the record does not reflect whether Thomas ever sought such deed releases, it does reflect that Thomas eventually acquired full title to Parcels A and B and then built a deep road cut that changed the existing topography and created a four- to six-foot barrier to automobile access to the unopened way.

¶27 And then Deborah Heg, as a condition of the county's approval of the boundary line adjustment between Parcels A and B, provided the county with written assurance that Parcel B will always be able to access the county road across Parcel A. Ms. Heg also reconfigured the way in such a manner as to serve both the main house on Parcel B and the guesthouse on Parcel A—and then paved the reconfigured way.

¶28 Under *Barnhart*, this evidence is sufficient to support a finding by a fair-minded trier of fact that Wheeler abandoned the easement, or that Thomas did, or even that Ms. Heg did. While only one such abandonment necessarily must be proved, the Alldredges are not required to elect which owner's actions they will rely upon in order to survive summary judgment.

¶29 We are not persuaded by Ms. Heg's arguments to the contrary. While it is true that a property owner is not limited to only one means of access, the fact that such an owner (or predecessor owner) elects to create a way across his own property and to secure its permanent use for himself and his assigns, and not only fails to use an unopened right of way across another's property but also creates a barricade cutting off his own convenient access to

the unopened way, creates a strong inference of abandonment of the unopened way. At this juncture, the Alldredges are entitled to the benefit of that inference, and the trial court erred in granting summary judgment.

## Equitable Estoppel

¶30 The Alldredges argue in the alternative that even if there has been no abandonment of the unopened way by Ms. Heg and her predecessors, nevertheless equitable estoppel bars Ms. Heg from using the easement for access. Equitable estoppel requires three elements:

> (1) An admission, statement, or act inconsistent with the claim afterwards asserted; (2) action by the other party on the faith of such admission, statement, or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement or act.

*Arnold v. Melani*, 75 Wn.2d 143, 147, 437 P.2d 908, 449 P.2d 800 (1968). The doctrine of equitable estoppel is based on the principle that a person shall not be permitted to deny what he or she has once solemnly acknowledged. *Id.* But the "solemn acknowledgment" need not have been express or intentional:

> "An easement may be extinguished by conduct of the owner of it even though he had no intention to give up the easement. This is due to the general principle that the owner of an easement will not be permitted to change a position once taken by him if the change would cause undue hardship to the owner of the servient tenement."

*Humphrey v. Jenks*, 61 Wn.2d 565, 567-68, 379 P.2d 366 (1963) (quoting 2 AMERICAN LAW OF PROPERTY § 8.99, at 305) (1952). Thus, where the conduct of an owner of an easement (or that of his predecessors) does not suffice to establish abandonment of the easement, it may nevertheless suffice to bar enforcement where there has been a change of position by the owner of the servient estate and resulting hardship.

¶31 The question in the instant case then becomes this: If following our remand a trier of fact decides that there has

been no abandonment of the easement by Ms. Heg or her predecessors, are there nevertheless genuine issues of material fact permitting the Alldredges to try their claim of equitable estoppel?

¶32 Because there is sufficient evidence to support a finding of abandonment, there is also sufficient evidence to support the first element of equitable estoppel—admissions, statements or acts inconsistent with the claim afterward asserted. With respect to the second element—action on the part of the Alldredges in reliance upon such admission, statement or act—the Alldredges point to the following: (1) With the express approval of the Hegs, the Alldredges placed an expensive drainage system on the downhill portion of the easement, and to permit the road to be opened on the uphill portion of the easement would necessarily block the flow of water and render the drainage system useless; (2) in reliance upon the apparent abandonment of the easement, the Alldredges have incorporated the portion of the easement that abuts their parcels into their yard, which includes the planting of trees and other expensive landscaping, and have placed their house on the site accordingly; and (3) quite aside from their understanding that the easement had been abandoned, they have relied to their detriment upon the assertion by Mr. Heg that unless the boundary adjustment were consummated, the Hegs would assert a claim to enforce the easement—indicating that if they did complete the deal there would be no lawsuit.

¶33 In response, Ms. Heg contends that since the drainage system is located within 10 feet of the western boundary of the easement, and the easement is 60 feet wide, there is plenty of room for both the road and the drain; moreover, construction of a road would necessarily require recognition that water flows downhill so that a system would need to be installed uphill of the road to tie into the existing drainage system. Clearly, Ms. Heg has the better argument with respect to the drain—so much so that a reasonable trier of fact could not reach a different conclusion. Thus, as did the trial court, we reject the drain as

evidence of reliance and extreme hardship if the road were to be built.

■ ¶34 As for the land swap by which the boundary line adjustment between these parties was consummated, a careful reading of the record reveals no evidence that a relinquishment of Ms. Heg's potential claim with respect to the easement was any part of the bargain. It is clear that the parties discussed the boundary line adjustment between Parcels B and D before Ms. Heg ever purchased her parcels, and that Ralph Alldredge indicated willingness to consider the matter because the then-existing boundaries were counterintuitive in light of the topography of the land in the area where the easement abutted Parcels A and B. Within a year after that conversation, and after Ms. Heg purchased the property, Ralph Alldredge explained the history of the easement to the Hegs and told them why he believed the easement had long since been abandoned. Apparently, Ms. Heg remained silent in the face of this explanation, neither agreeing nor disagreeing with the views expressed. Her silence cannot reasonably be construed as an admission, however, because she had no obligation to respond to the explanation. Although it is clear that the Hegs discussed between themselves whether to give up their potential rights to enforce the easement in exchange for the boundary line adjustment, it is equally clear that they never made such a proposal; nor did the Alldredges make such a proposal. Instead, Mr. Heg made a veiled threat of future litigation regarding the easement if the boundary adjustment were not consummated and Mr. Alldredge took this to mean that if the boundary adjustment was made, there would be no future litigation.

■ ¶35 Certainly a rational trier of fact could conclude that the Alldredges never would have consummated the deal if they had realized that Ms. Heg was going to sue them anyway. But there is simply no evidence that the land swap caused any hardship to the Alldredges. Instead, the exchange was mutually beneficial because it brought the parties' respective boundary lines into better conformity

with the topography of the land. Again, Ms. Heg has the better position, and a rational trier of fact could not decide otherwise on the evidence in this record. As did the trial court, we reject the land swap as a basis for equitable estoppel.

¶36 The Hegs do not respond to the Alldredges' contention that (as have several of their neighbors to the south) they have relied to their detriment upon the conduct of Ms. Heg's predecessors indicating abandonment of the easement by incorporating the portion of the 60-foot strip that abuts their parcels into their yard, and by choosing their building site on the assumption that they had a yard, not a roadway, in front of their house. We also note that if the road were to be built, the Alldredges' driveway leading to Smugglers Lagoon Lane would lie on the other side of the roadway from their house. To this extent, the Alldredges have presented a viable claim for equitable estoppel, although their other contentions with respect to equitable estoppel must fail.

### Weighing of Hardships

¶37 Finally, the Alldredges construe the trial court's ruling to permit Ms. Heg to place her road anywhere within the 60-foot strip that she desires without regard to the relative hardships that could result to her neighbors to the south, in terms of landscaping and in terms of the Sages' septic mound. They ask this court to clarify that, in the event that Ms. Heg should prevail following our remand, her placement of the roadway remains subject to future court review.

¶38 We agree that this is appropriate—although we hasten to add that it is far from clear to us that the trial court actually intended to preclude any such future review. At the conclusion of the summary judgment proceeding, and although Ms. Heg had prevailed, it was far from clear whether she intended ever to actually build the roadway. She herself did not know whether she ever would do so, and

her purpose in bringing the lawsuit was only to preserve her right to do so at some indeterminate time in the future. Thus, as the Alldredges concede, the trial court was not required to address relative hardships at that juncture, and will not be so required unless and until the roadway is actually built.

¶39 We think the trial court's ruling that in the meantime, while Ms. Heg holds her options open, the neighbors utilize the easement for other than roadway purposes at their own risks was not intended to preclude future court review of any actual placement of the roadway. But in an excess of caution, to the extent that the trial court may have so intended, we modify the ruling to expressly preserve the relative hardship issues for future review—in the event that the roadway is ever built.

¶40 In conclusion, we reverse in part and remand for such further proceedings as shall be consistent with this opinion, specifically for a trial on the issue of abandonment and on the single theory of equitable estoppel that has

survived this appeal. We affirm the trial court's remaining rulings except as expressly modified herein.

SCHINDLER, J., concurs.

Appendix A

EXHIBIT D

Configuration of Pope Tracts 1 and 2 showing creation of Parcel J conveyed to Alldredge on July 17, 1989.

NOTE: The configuration of Parcels B, D, F, G, H, I and J were subsequently modified by boundary line adjustments.

NOT TO SCALE

316

Appendix B

EXHIBIT F

Smugglers Cove Road

Parcel A

Studio

House

Parcel B

Parcel C

Parcel D

Parcel J

Parcel K

E G

F W

I

Parcel K

Easement Area

Present configuration of Parcels
Following completion of Heg/Alldredge
Boundary Line Adjustment in 2000

NOT TO SCALE

349

¶41 BECKER, J. (dissenting) — I respectfully dissent. The majority would allow a jury to extinguish the unused easement simply because Ms. Heg has another way out of

her property. It is not so easy to prove that a person holding record title to an easement has intentionally abandoned it. I would affirm the trial court's judgment quieting Ms. Heg's title to the unopened road easement.

¶42 Ms. Heg holds title to an access easement across the Alldredge property. The easement, Parcel J, has been of record since 1957. It is appurtenant to both of Ms. Heg's parcels, Parcel A to the north and Parcel B to the southwest. Ms. Heg and her immediate predecessors—Wheeler and Thomas—have not needed to make use of the Parcel J easement because they have an existing road to the north, across Parcel A. That northern outlet presently serves as the driveway from Ms. Heg's home on Parcel B out to the main road, Smugglers Cove Road. Ms. Heg has always maintained Parcels A and B as separate parcels, each with its own address, drainfield and electric transformer. She has established a two-party well system and attendant private water association.[3]

¶43 By virtue of a contract between Wheeler and Thomas, Parcel B has guaranteed access to Smugglers Cove Road by means of a permanent easement across Parcel A. This is the northern outlet that presently serves as the driveway to the Heg residence. Ms. Heg wants to retain the Parcel J easement in case she sells one of her parcels, so that each parcel can then have its own driveway.

¶44 South of the Heg property and west of the easement is a waterfront parcel owned by the Alldredges on which they have built a vacation cabin. They have incorporated the area of the easement into their landscaping. This they are entitled to do, so long as Ms. Heg or her successors do not choose to open a road through the easement. *Steury v. Johnson*, 90 Wn. App. 401, 406, 957 P.2d 772 (1988) (servient owner entitled to use easement area in ways that do not unreasonably interfere with the rights of the owner of the dominant estate).

---

[3] Clerk's Papers at 385.

¶45 The Alldredges would prefer that the easement never be opened as a road. They have persuaded the majority that evidence exists from which a jury could find that Ms. Heg or her predecessors abandoned the Parcel J easement.

¶46 The Alldredges summarize their theory as follows: "the fact that a benefited property has never used an access easement and has instead historically used another access route, constitutes evidence that the easement has been abandoned and the route actually used has been substituted when other evidence of abandonment, such as nonuse, exists." Br. of Appellant at 13.

¶47 Allredges' "use it or lose it" argument fails in light of the well-established principle that mere nonuse of an easement, for no matter how long a period, will not extinguish the easement. *Winsten v. Prichard*, 23 Wn. App. 428, 431, 597 P.2d 415 (1979). Nonuse "must be accompanied with the express or implied intention of abandonment." *Netherlands Am. Mortgage Bank v. E. Ry. & Lumber Co.*, 142 Wash. 204, 210, 252 P. 916 (1927). The fact that Ms. Heg's parcels already have one outlet going east, across the upper parcel, does not prove that she or her predecessors ever intended to abandon their right to develop a distinct and completely unrelated outlet going south from her lower parcel—any more than the building of a house on one corner of a parcel evinces an intent to abandon a right to build on the other corners.

¶48 The Alldredges inaccurately state the holding of the single case on which they rely, *Barnhart v. Gold Run Inc.*, 68 Wn. App. 417, 843 P.2d 545 (1993). *Barnhart* is a case where a single right of way was found to have shifted its location. It is not a case like the present where the landowner possesses two distinct rights of way, and the court is asked to infer that she has abandoned one because she uses the other.

¶49 *Barnhart* involved three neighboring lots with a common platted 30-foot right of way running along their northern boundaries and providing access to a state high-

way to the west. Long before the Barnharts acquired the easternmost of the lots in question, Ms. Harris, a predecessor who owned all three lots, had built a house that encroached into the common right of way. She constructed a "jeep road" north of the platted right of way that she used instead of the platted route. The Barnharts wanted to quiet title to their right to use the platted right of way. The trial court held that Mrs. Harris had acquired title to the platted road right of way by adverse possession. Upon appeal by the Barnharts, the Court of Appeals affirmed. "The undisputed evidence supports a finding the location of the platted road right of way shifted to the existing road, due to a long period of use which predated the parties' ownership." *Barnhart*, 68 Wn. App. at 420-21.

¶50 In so holding, the *Barnhart* court distinguished two cases which had upheld the continuing validity of unopened easements as against the adverse possession claims of neighbors, *Burkhard v. Bowen*, 32 Wn.2d 613, 623, 203 P.2d 361 (1949), and *Van Buren v. Trumbull*, 92 Wash. 691, 694, 159 P. 891 (1916). The court relied instead on another shifting easement case, *Curtis v. Zuck*, 65 Wn. App. 377, 829 P.2d 187 (1992). The plaintiffs in *Burkhard* and *Van Buren* lost on appeal because they had "attempted to extinguish the private easements of adjoining landowners by affirmatively *excluding* them from their right to use the platted alley or street." *Barnhart*, 68 Wn. App. at 422. In *Curtis*, by contrast, when the plaintiffs attempted to enforce a private easement as platted, the defendants won on the theory that the private easement they shared with the plaintiffs had simply shifted due to a period of long use that predated both parties' ownership. *Barnhart*, 68 Wn. App. at 422; *Curtis*, 65 Wn. App. at 382.

¶51 The Alldredges are not like the defendants in *Barnhart* and *Curtis*. They are not asserting that the Parcel J easement has shifted in location over time. Rather, they are like the plaintiffs in *Burkhard* and *Van Buren*, in that they are trying to exclude Ms. Heg from her right to use an easement to which she holds record title. Ms. Heg's open

driveway across Parcel A is not a "substitute way," as the majority must characterize it in order to follow *Barnhart*. Majority, at 308. It did not come into existence through use as a substitute for the recorded location of Parcel J. Ms. Heg's driveway is completely distinct from the Parcel J easement. The use of the upper driveway as the primary access route by Ms. Heg and her predecessors provides no evidence whatsoever of their intentions with regard to the unopened Parcel J easement.

¶52 Besides the existence of a second road, the majority relies on one other item of evidence—a deep road cut across Parcel B where it abuts the Parcel J easement. Majority at 302, 309. In the proceedings below, this road cut was not presented as evidence of an intent to abandon. It was mentioned by Alldredge only as evidence that Ms. Heg and her predecessors had not used the easement.[4] Neither party mentions the road cut in their briefs on appeal. Because Ms. Heg has not had an opportunity to argue against the proposition that the road cut shows an intent to abandon the easement, it is not fair for this court to consider it sua sponte as a basis for defeating summary judgment. But in any event, the road cut does not support an inference of intention to abandon the easement. The road cut is simply evidence of nonuse. At most, it manifests a desire by the owner of Parcels A and B to keep others from using the easement as a back door route into Parcels A and B.

¶53 The majority attempts to bolster the significance of the road cut by stating, "Placement by the grantee of a barrier rendering use of a right of way impossible or impractical will support a finding of abandonment." Majority at 307. However, there is no evidence in the record demonstrating that it would be impossible or impractical to fill the road cut at such time as Ms. Heg or her successors decided to open the easement. Neither is there any common-sense reason to assume that a road cut is a permanent and unalterable barrier. Nor is there any evidence that the road

---

[4] Clerk's Papers at 117, 134.

cut makes it impossible or impractical for Ms. Heg to use the easement for walking; indeed, it is undisputed that she does so use it. Furthermore, the majority's proposition is not supported by the case the majority cites for it, *Northern Pacific Railway v. Tacoma Junk Co.*, 138 Wash. 1, 244 P. 117 (1926). The railroad in that case had removed the rails from a small portion of the track; the court allowed that small portion to revert to the grantor only because the terms of the railroad franchise specifically provided for reversion if the railroad stopped using the track and removed the rails. *N. Pac. Railway*, 138 Wash. at 5. Because the issue in *Northern Pacific Railway* turned on the terms of a contract, its holding does not affect the common law as to abandonment of easements generally. Nothing in that case leads to the conclusion that an owner who places a road cut across an unopened easement thereby signals an intention never to open or use the easement as a road.

¶54 In summary, neither Ms. Heg's use of the distinct northern access route nor her failure to remove the road cut at the southern edge of her property manifests an intent to abandon her record title to the Parcel J easement. And the record contains no evidence of conduct or statements by Ms. Heg or her predecessors that is inconsistent with her present claim to title in the easement. Therefore, the Allredges' theory of equitable estoppel is unsupported.

¶55 By incorrectly interpreting *Barnhart*, the majority has adopted a theory that the owner of a parcel of real property may not benefit from a recorded but unused easement appurtenant if the parcel has an alternative means of ingress and egress. The adoption of this theory will undoubtedly invalidate a large number of easements recorded throughout the state of Washington. The trial court's judgment appropriately enforces well-settled rules of the law of property. It should be affirmed.

Reconsideration denied January 20, 2005.

Review granted at 155 Wn.2d 1008 (2005).