

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ERIN L. BRANT, a married person; and ERIN L. BRANT on behalf of her minor child H.B.,† | ) ) ) ) | No. 40757-8-III |
| Appellants, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| JAMES S. SHAW and DOE SHAW, and their marital community; DOE 1; DOE 2; and DOE 3, | ) ) ) ) | |
| Respondents. | ) ) | |

COONEY, J. — Erin Brant's vehicle, occupied by Ms. Brant and her child, was

rear-ended by a vehicle driven by James Shaw, MD. Ms. Brant sued Dr. Shaw for

negligence. Dr. Shaw answered the complaint, asserting the affirmative defense of an

unforeseen medical emergency. Dr. Shaw later moved for summary judgment dismissal

---

† To protect the privacy interests of H.B., we use her initials throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title* (Wash. Ct. App. Aug. 22, 2018)(effective Sept. 1, 2018), http://www.courts.wa.gov/appellate_trial_courts.

of Ms. Brant's complaint, alleging he suffered an unforeseen stroke at the time of the collision. The court granted Dr. Shaw's motion. Ms. Brant appeals, arguing genuine issues of material fact exist related to whether Dr. Shaw's stroke caused the collision and whether Dr. Shaw's stroke was foreseeable. We agree with Ms. Brant, reverse the order on summary judgment, and remand for further proceedings.

BACKGROUND

On March 7, 2022, Ms. Brant was driving on Highway 2 in Spokane, Washington, with her minor child, H.B. Ms. Brant came to a stop for a red traffic light in the left turn lane at the intersection of Highway 2 and East Farwell Road. Dr. Shaw, also travelling on Highway 2, failed to stop and collided with the rear of Ms. Brant's vehicle. It was later discovered that Dr. Shaw had suffered a stroke.

Ms. Brant filed a complaint for damages against Dr. Shaw. Dr. Shaw asserted the affirmative defense to negligence of a sudden loss of consciousness in his answer to the complaint. Dr. Shaw then moved for summary judgment dismissal of Ms. Brant's complaint based on his "unforeseen medical emergency." Clerk's Papers (CP) at 47.

Dr. Shaw argued that his stroke "rendered him unable to control his vehicle" and that the stroke was unforeseeable. CP at 48. He contended this "[u]nforeseen [m]edical [e]mergency" was a complete defense to liability. CP at 50. Dr. Shaw presented a declaration from Bryan Fuhs, MD, portions of a deposition transcript of Jennifer Pary, MD, and portions of his own deposition in support of his motion.

2

Dr. Fuhs declared that Dr. Shaw is a patient of his who had suffered transient ischemic attacks (TIA) in 2016 and 2021. On March 2, 2022, Dr. Fuhs diagnosed Dr. Shaw with atrial fibrillation and prescribed the drug Eliquis to him. Dr. Fuhs never advised Dr. Shaw that he could not drive. He also did not think anything in Dr. Shaw's medical history indicated he was in imminent danger of suffering a stroke. Finally, Dr. Fuhs declared, "Dr. Shaw's sudden stroke in the seconds preceding the collision [with Ms. Brant] was not reasonably foreseeable." CP at 19.

At her deposition, Dr. Pary testified that Dr. Shaw was one of her patients. Dr. Pary stated she treated Dr. Shaw for his 2021 TIA. She testified that Dr. Shaw followed her recommended treatment plan after his TIA. Dr. Pary explained that a TIA means "that you have focal neurological symptoms, presumably due to a clot blocking a blood vessel that supplies the area that causes those symptoms." CP at 26. Dr. Pary testified, "the clot breaks up and doesn't cause permanent damage [and] the patient completely resolves and goes back to normal." CP at 26. Dr. Pary also testified, "a stroke means that they have the clot blocking the artery, and unfortunately, they have—they suffer damage on the [magnetic resonance imaging] and most often permanent neurological damage." CP at 29. Dr. Pary stated that TIAs "can be" a warning sign or indicator of a future stroke. CP at 30. Dr. Pary stated she never informed Dr. Shaw not to drive and did not think he was in imminent danger of suffering

3

a stroke when the collision with Ms. Brant occurred.  Finally, Dr. Pary indicated that Dr.

Shaw's stroke was caused by atrial fibrillation.

Dr. Shaw testified at his deposition that he had no medical conditions affecting his

ability to drive at the time of the collision with Ms. Brant.  Dr. Shaw stated that he felt

he was in his "usual state of good health" on the morning of the collision.  CP at 43.

Dr. Shaw testified that he was aware of the warning signs of a stroke, and he was not

aware that he was having any of those warning signs on the day of the collision.  Finally,

Dr. Shaw stated that his doctors never instructed him not to drive.

In response to Dr. Shaw's motion for summary judgment, Ms. Brant argued that it

was unclear whether Dr. Shaw experienced warning signs of his stroke "or when his

stroke began," albeit Dr. Shaw did suffer a stroke at some point during the day.  CP at 64.

Ms. Brant also contended Dr. Shaw's "failure to begin taking the medication prescribed

by his physician made it more likely that he would suffer another stroke."  CP at 64.

Finally, Ms. Brant argued Dr. Shaw failed to show his stroke was not reasonably

foreseeable as required for his affirmative defense.  In support of her response, Ms. Brant

presented a declaration from Alexander Merkler, MD,[1] and portions of Dr. Shaw's

deposition transcript.

---

[1] Dr. Shaw brought a motion to strike Dr. Merkler's declaration.  That motion was heard at the same time as Dr. Shaw's summary judgment motion.  The court ruled it would consider Dr. Merkler's later filed amended declaration.

Dr. Merkler discussed Dr. Shaw's prior TIAs and explained that a TIA is a "warning stroke." CP at 88. He stated the "only difference between a stroke and a TIA is that with [a] TIA the blockage is [temporary and] there is no permanent injury to the brain." CP at 88. Dr. Merkler explained that "TIAs are often warning signs that a person is at risk for a more serious stroke," and that "[a]bout one in three people who have a TIA will eventually have a stroke." CP at 88. He also stated that atrial fibrillation is a stroke risk factor and that about "15% to 20% of people who have strokes have [atrial fibrillation]." CP at 89. He declared that "Dr. Shaw's stroke was caused by his atrial fibrillation." CP at 89. Finally, Dr. Merkler stated Dr. Shaw did not take his first dose of Eliquis until the morning of the collision, five days after it was prescribed, and that had he taken it "for a longer period of time, his stroke may not have happened." CP at 90.

Dr. Shaw testified at his deposition that he went to Holy Family Hospital on the day of the collision to pick up a copy of an echocardiogram and had a stroke as he was returning home. He said his memory was vague after hearing the sound of a loud crash. Dr. Shaw testified he "remember[ed] an [emergency medical technician (EMT)]. I believe he was opening the driver side door or trying to . . . He said, 'His right arm is flaccid. It has no control or strength. It appears that he's having a stroke.'" CP at 77-78. Dr. Shaw testified he did not remember anything between when he was at "Holy Family until the car accident happened." CP at 80.

5

Following a hearing, the court granted Dr. Shaw's motion for summary judgment, thereby dismissing Ms. Brant's complaint. Ms. Brant moved for reconsideration, and the court denied the motion.

Ms. Brant timely appeals.

## ANALYSIS

Ms. Brant argues the court erred when it granted Dr. Shaw's motion for summary dismissal of her claims. We agree with Ms. Brant and reverse.

We review orders on summary judgment de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is only appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). The moving party bears the initial burden of establishing that there are no disputed issues of material fact. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990).

When considering a motion for summary judgment, evidence is considered in a light most favorable to the nonmoving party. *Keck*, 184 Wn.2d at 370. If the moving party satisfies its burden, then the burden shifts to the nonmoving party to establish there is a genuine issue for the trier of fact. *Young*, 112 Wn.2d at 225-26. While questions of fact are typically left to the trial process, they may be treated as a matter of law if

6

"reasonable minds could reach but one conclusion." *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985).

A nonmoving party may not rely on speculation or having its own affidavits accepted at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). Instead, a nonmoving party must put "forth specific facts that sufficiently rebut the moving party's contentions and disclose that a genuine issue as to a material fact exists." *Id.*

Ms. Brant argues there are disputed issues of material fact as to: (1) whether Dr. Shaw's stroke and loss of consciousness caused the collision, and (2) whether Dr. Shaw's stroke was foreseeable. In considering the evidence in a light most favorable to Ms. Brant, we agree there exist questions of material fact related to both issues.

A "'driver who becomes suddenly stricken by an unforeseen loss of consciousness, and is unable to control the vehicle, is not chargeable with negligence.'" *Courtright v. Youngberg*, 4 Wn. App. 234, 235 n.2, 480 P.2d 522 (1971) (quoting *Kaiser v. Suburban Transp. Sys.*, 65 Wn.2d 461, 466, 398 P.2d 14 (1965)). Moreover, the *Restatement (Third) of Torts* states:

> Sudden incapacitation can be caused by a heart attack, a stroke, an epileptic seizure, diabetes, or other medical conditions. A typical case is sudden incapacitation that causes a driver to lose control of the car. This is distinctly dangerous and substandard driving which, absent incapacitation, would easily merit a finding of negligence.

RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 11 cmt. D (A.L.I. 2010). A driver asserting the defense of sudden incapacitation has the burden of proving, by a preponderance of the evidence, that they could not have foreseen their loss of consciousness. *Braatz v. Braatz*, 2 Wn. App. 2d 889, 898, 413 P.3d 612 (2018).

*Causation*

Ms. Brant argues there exists questions of material fact related to causation. Specifically, whether Dr. Shaw's stroke and loss of consciousness are what *caused* the collision. We agree.

In support of her argument, Ms. Brant primarily relies on two cases: *Courtright v. Youngberg*, and *Shoker v. McCann*, No. 804478-2-I, (Wash. Ct. App. Mar. 29, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/804782.pdf.

In *Courtright*, Mr. Youngberg, the driver of a vehicle who allegedly lost consciousness and caused a collision, argued he should have been allowed to present the affirmative defense to negligence of a sudden unforeseeable loss of consciousness to the jury. 4 Wn. App. at 235. Mr. Youngberg testified at trial that "he recalled crossing the railroad tracks 3 blocks from the intersection [where the collision occurred]," but he did not remember exactly what happened other than that he was in an accident. *Id.* at 236. Mr. Youngberg testified he "received a bump on the head from the accident" and stated he thought he may have been knocked unconscious by the collision. *Id.* Officers who responded to the collision testified that Mr. Youngberg appeared to be dazed and seemed

to have no recollection of what happened. *Id.* This court stated that "all [the] evidence shows is that Youngberg does not remember [w]hat happened, not [w]hy he does not remember." *Id.* The court explained that his loss of recollection could have been from the head injury he sustained during the collision that could have caused retrograde amnesia. *Id.* Thus, the court held the trial court correctly refused to submit the affirmative defense to the jury. *Id.* at 236-37.

In *Shoker*, Mr. McCann was the driver of a vehicle who allegedly lost consciousness and caused a collision. *Shoker*, slip. op at 1. Mr. McCann stated he felt a "'blood rushing' sensation and 'lost awareness immediately.'" *Id*. at 2. Mr. McCann next remembered being "'up against the side of a building.'" *Id.* However, he had no recollection of driving a block and stopping at a red light after he purportedly lost awareness. *Id.* This court held there were issues of material fact related to when Mr. McCann lost consciousness. *Id.* at 3. The court explained that the driver's sudden loss of consciousness when he first began to lose awareness would be inconsistent with "his ability to drive a block, slow to stop for a red light, and then accelerate at normal speed when the light turned green." *Id*. at 8. This left "unresolved questions of fact about the timing of any unconsciousness." *Id.*

Here, it is unclear whether Dr. Shaw fell unconscious prior to the collision due to a stroke and thereby causing the collision. Indeed, there is no independent evidence of the collision in the record nor were there any passengers in Dr. Shaw's vehicle to testify

about when or if he lost consciousness. Moreover, Dr. Shaw admitted he does not clearly remember most of the events leading up to the collision or the collision itself. Instead, Dr. Shaw testified at his deposition that he remembered the sound of a crash and an "EMT . . . opening the driver side door or trying to" after the collision. CP at 77. The fact that Dr. Shaw remembers hearing the sound of the collision cuts against his defense that he was unconscious at the time of the collision. Based on the evidence in the record, there exists a genuine issue of material fact as to whether Dr. Shaw's stroke or a loss of consciousness caused the collision.

Dr. Shaw argues the medical testimony in the record demonstrates his stroke was caused by atrial fibrillation and not by the collision. He posits that there is uncontroverted evidence in the record demonstrating his sudden stroke caused the collision. Here, the parties agree Dr. Shaw suffered a stroke and that the stroke was caused by atrial fibrillation. However, it is not clear that the stroke and any accompanying loss of consciousness is what *caused* the collision. Thus, a genuine issue of material fact lingers.

*Foreseeability*

Assuming Dr. Shaw's loss of consciousness is what caused the collision, Ms. Brant contends there is a genuine issue of material fact related to whether the stroke that caused the loss of consciousness was foreseeable. We agree.

10

Whether a loss of consciousness is foreseeable to the driver "depends on what information was available to the actor indicating that at some uncertain point in the future the actor might suffer an instance of incapacitation while engaging in a potentially dangerous activity such as driving." *Restatement* § 11 cmt. d (2010). Evidence bearing on the issue of foreseeability includes:

> (1) "the number and frequency of episodes of incapacitation in the past"; (2) "the circumstances of those episodes, insofar as those circumstances bear on the likelihood of a reoccurrence"; (3) "the extent to which medical treatment the actor is receiving can be expected to control the underlying medical problem"; and (4) "whatever advice the actor's physician has provided."

*Sartin v. Estate of McPike*, 15 Wn. App. 2d 163, 173-74, 475 P.3d 522 (2020) (quoting RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 11(b) (A.L.I. 2010)). Foreseeability of loss of consciousness is typically a question of fact left to the jury. *Id.*

In *Kaiser v. Suburban Transportation System*, a bus driver caused a collision after falling unconscious due to side effects of a drug prescribed by his physician. 65 Wn.2d at 462-63. The bus driver claimed his physician did not warn him about the possible side effects of the drug. *Id.* at 463. However, the bus driver admitted he began feeling groggy and drowsy a few miles prior to the site of the accident. *Id.* The court held the driver could not be found negligent as a matter of law if he was not warned about the side effects of the drug. *Id.* at 466-68. The court explained, "[k]nowledge and conscious appreciation of the significance of facts constituting premonitory warning of sleep or incapacity to the driver is essential to sustain the bus driver's liability." *Id.* at 468.

11

Nevertheless, the court did not foreclose the possibility that a jury could find the bus

driver negligent based on his continued driving after becoming drowsy. *Id.* at 469.

Later, in *Presleigh v. Lewis*, Mr. Lewis blacked out and caused a collision after a

doctor gave him an anti-nausea injection and warned him that the "shot could affect his

driving." 13 Wn. App. 212, 213, 534 P.2d 606 (1975). Mr. Lewis, however, testified his

doctor told him he could drive but to avoid freeways or places he could be caught in

traffic. *Id.* This court explained that "[o]ne who undertakes to drive his automobile has a

duty to drive it in a reasonable manner so as not to injure another in his person or

property." *Id.* at 214. The court stated that Mr. Lewis "breached that duty as a matter of

law when he undertook to drive his automobile knowing his ability to drive in a

reasonable manner might be affected." *Id.*

More recently, in *Sartin*, a bus driver suffered cardiac arrest, fell unconscious, and

caused a collision. 15 Wn. App. 2d at 170. The bus driver was 58 years old at the time

and had multiple health issues that increased his risk of developing a heart condition in

the future including diabetes mellitus, hypertension, high cholesterol, and obesity. *Id.* at

167. The bus driver's primary care provider stated the bus driver had never reported

precursor signs of sudden cardiac arrest and had no history of coronary heart disease or

other heart conditions. *Id.* This court held that because the driver had never experienced

a loss of consciousness, had no history of any heart problems that could cause a sudden

cardiac arrest and his other medical problems were under control, and none of his doctors

believed it was unsafe for him to operate a bus, as a matter of law, his loss of consciousness was unforeseeable. *Id.* at 179-80.

Here, the parties do not dispute that Dr. Shaw suffered a stroke. In support of his motion for summary judgment, Dr. Shaw presented a declaration from Dr. Fuhs and excerpts from his and Dr. Pary's depositions. Dr. Fuhs declared that Dr. Shaw experienced two TIAs: one in 2016 and one in 2021. He explained that he diagnosed Dr. Shaw with atrial fibrillation on March 2, 2022, and prescribed him Eliquis to manage it. Dr. Fuhs stated he never instructed Dr. Shaw to not drive a motor vehicle. Finally, Dr. Fuhs declared, "Dr. Shaw's medical history did not indicate he was in imminent danger of suffering a stroke." CP at 18.

Dr. Pary testified that she treated Dr. Shaw for his 2021 TIA. Dr. Pary indicated that, to her knowledge, Dr. Shaw was following her recommended treatment following his TIA. Dr. Pary admitted a TIA can be a warning sign or an indicator of a future stroke. Dr. Pary opined that atrial fibrillation caused Dr. Shaw's stroke.

Finally, Dr. Shaw testified that he did not have any medical conditions restricting his ability to drive at the time of the accident. Dr. Shaw claimed he was not aware that he was having any warning signs or stroke symptoms on the day of the collision with Ms. Brant.

In response to Dr. Shaw's motion, Ms. Brant submitted excerpts from Dr. Shaw's deposition as well as a declaration from Dr. Merkler. Dr. Merkler opined that Dr. Shaw

13

suffered a stroke on March 7, 2022, and that the stroke was caused by atrial fibrillation. Moreover, Dr. Merkler declared that TIAs are warning strokes, and "about one in three people who have a TIA will eventually have a stroke." CP at 128-29. Further, he indicated other stroke risk factors include atrial fibrillation. Dr. Merkler declared about "15% to 20% of people who have a stroke have [atrial fibrillation]." CP at 129. Dr. Merkler indicated Dr. Shaw did not take his first dose of Eliquis until the morning of the collision, five days after it was first prescribed. He opined that "[t]aking Eliquis when it was first prescribed would have significantly reduced Dr. Shaw's risk of a blood clot forming and therefore his risk of stroke." CP at 131.

Ms. Brant argues the proper inquiry is not whether Dr. Shaw's stroke or loss of consciousness was foreseeable on this particular occasion but whether the collision fell within the general field of danger that was foreseeable. Ms. Brant quotes *McLeod v. Grant County School District Number 128* to support his contention that "[t]he standard of 'reasonable foreseeability' does not require that the defendant was put on notice of a specific danger; rather the question is whether a particular risk was 'within a general field of danger which should have been anticipated.'" Pet'r's Op. Br. at 29 (quoting 42 Wn.2d 316, 321, 255 P.2d 360 (1953)).

Contrary to Ms. Brant's argument, there is well-settled law regarding a sudden loss of consciousness holding that there is no negligence unless the *sudden loss of consciousness* was foreseeable to the defendant. *Kaiser*, 65 Wn.2d at 466; *Sartin*, 15 Wn.

14

App. 2d at 177. *McLeod* addressed foreseeability in the broader context of the scope of a legal duty. 42 Wn.2d at 319. In *McLeod*, a student sued the school district after students were left unsupervised, and she was forcibly raped in a dark room under the bleachers of the school gymnasium during recess. *Id.* at 318. The "general field of danger" was that a dark room under the bleachers of the gymnasium would be utilized "during periods of unsupervised play for acts of indecency between school boys and girls," whether that be "molestation, indecent exposure, seduction" or forcible rape. *Id.* at 322-23. The court explained that if the children had "been safeguarded against any of these acts of indecency, through supervision or locking of the door, they would have been protected against all such acts." *Id.* Conversely, this case "involves the foreseeability of a very specific event"—Dr. Shaw's loss of consciousness. *Sartin*, 15 Wn. App. 2d at 178.

Turning to the merits, the record before us sufficiently raises a question of material fact as to the foreseeability of Dr. Shaw's stroke and loss of consciousness. The medical testimony shows Dr. Shaw was at high risk of suffering a stroke. Moreover, Dr. Merkler opined that had Dr. Shaw taken his medication for atrial fibrillation when prescribed, then his stroke risk would have been lessened significantly.

Furthermore, applying the foreseeability factors from the *Restatement (Third) of Torts*, Dr. Shaw had experienced two TIAs in the past, had a history of medical problems, including atrial fibrillation, which increased his stroke risk, and was prescribed medication to control his atrial fibrillation but may not have taken it until five days after

it was first prescribed. Even though Dr. Shaw's medical providers did not tell him not to drive, application of these factors supports the conclusion that there is an issue of material fact regarding whether Dr. Shaw's stroke and sudden loss of consciousness was foreseeable.

## CONCLUSION

Genuine issues of material fact persist related to causation and foreseeability. We reverse the trial court's order on summary judgment and remand for further proceedings.

_____
Cooney, J.

WE CONCUR:

_____
Staab, A.C.J.

_____
Fearing, C.J.